John P. BRANDENBURG; John P. Huffman, as custodian for Robert F. Coon, a minor; Baikunth K. Singh; Mridulah Singh; custodian for Anup Singh, a minor, and for Alka Singh, a minor; and Frank J. Talbot

v.

FIRST MARYLAND SAVINGS AND LOAN, INC.; Julian Seidel; Frank J. Calcara; David P. Cole; Robert Corletta; Edward A. Dacy; Michael Finci; Ronald Freudenheim; Alan S. Kerxton; Benjamin Maisel; Gloria Meyers; James Porter; Anne Sherman; Charles C. Hogg, II; Frances P. Anderson; Leonard Bass; Dennis B. Berlin; Michael A. Deitz; Jerome F. Dolivka; John C. Donohue, Sr.; Henry R. Elsnic; John D. Faulkner; James D. Laudeman; Terry L. Neifeld; George W.H. Pierson; Paul B. Trice; Baltimore County Savings and Loan Association, Inc.; Chevy Chase Savings and Loan Association, Inc.; Cowenton Savings and Loan Association; Fairmount Savings and Loan Association; Madison and Bradford Savings and Loan Association; Parkville Savings and Loan Association; and Sharon Savings and Loan Association.

Civ. No. S 86–3556.

United States District Court,
D. Maryland.

May 8, 1987.

Arthur M. Kaplan, Edward B. Rock, Donald L. Perelman, Fine, Kaplan and Black, Philadelphia, Pa., Andrew P. Goldstein, Washington, D.C., Kieron F. Quinn, Robert B. Kershaw, Thomas J. Minton, Quinn, Ward and Kershaw, P.A., Baltimore, Md., for plaintiffs.

Michael J. Travieso, Michael W. Skojec, Gallagher, Evelius & Jones, Baltimore, Md., for defendants Baltimore County Sav. & Loan Assn., Cowenton Sav. & Loan Assn., Fairmount Sav. & Loan Assn. & Madison and Bradford Sav. & Assn.

William W. Cahill, Sherry H. Flax, Weinberg & Green, Baltimore, Md., David J. Cynamon, Shaw, Pittman, Potts & Trowbridge, Washington, D.C., for defendant Chevy Chase Sav. Bank.

Daniel F. Goldstein, Elizabeth M. Kameen, Brown & Goldstein, Baltimore, Md., for defendants Finci & Corletta.

Andrew H. Marks, David B. Siegel, Luther Zeigler, Crowell & Moring, Washington, D.C., for defendants Bass, Dietz, Dolivka & Elsnic.

Francis S. Brocato, Baltimore, Md., for defendant Trice.

John H. Zink, Cook, Howard, Downes & Tracy, Towson, Md., for defendant Hogg.

Richard H. Gins, Gins & Seeber, P.C., Washington, D.C., for defendant Dacy.

Thomas G. Bodie, William F. Mosner, Power & Mosner, Towson, Md., for defendant Laudeman.

Stephen C. Winter, T. Bruce Hanley, Ridgely, Hanley & Winter, Towson, Md., for defendants Anderson and Donohue.

John T. Kotelly, Dickstein, Shapiro & Morin, Washington, D.C., for defendant Calcara.

Jerold Oshinsky, Nancy A. Markowitz, Anderson, Baker, Kill & Olick, Washington, D.C., for defendant Pierson.

Howard B. Possick, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C., for defendant Faulkner.

James P. Ulwick, Michael L. Heikes, Kramon & Graham, P.A., Baltimore, Md., for defendant Seidel.

George A. Nilson, Stephen J. Immelt, Sheila Mossmiller Vidmar, Piper & Marbury, Baltimore, Md., for defendant First Maryland Sav. & Loan Assn.

Alva P. Weaver, III, Baltimore, Md., Charles F. Stein, III, Stein & Jett, Towson, Md., for defendant Parkville Sav. & Loan Assn.

Michael Schatzow, Melnicove, Kaufman, Weiner, Smouse & Garbis, Baltimore, Md., for defendant Sharon Sav. & Loan Assn.

Harold H. Burns, Jr., Maureen F. Mackey, Baltimore, Md., for defendant Neifeld.

Paul F. Kemp, Rockville, Md., for defendant Sherman.

Alan L. Tanenbaum, Bethesda, Md., for defendant Meyers.

Lawrence S. Greenwald, William D. Gruhn, Gordon, Feinblatt, Rothman, Hoffberger & Hollander, Baltimore, Md., for defendant Kerxton.

SMALKIN, District Judge.

## I.

On November 24, 1986, plaintiffs, John P. Brandenburg, and John P. Huffman, as custodian for Robert F. Coon, a minor, filed this action against thirty-two defendants (Paper No. 1). On January 20, 1987, plaintiffs filed an amended complaint, joining more plaintiffs and defendants (Paper No. 21.5). The amended complaint lists the parties as follows:

Plaintiffs—John P. Brandenburg; John P. Huffman, as custodian for Robert F. Coon, a minor; Baikunth K. Singh; Mridulah Singh, custodian for Anup Singh, a minor, and for Alka Singh, a minor; and Frank J. Talbot;

Defendants—First Maryland Savings and Loan, Inc. ("First Maryland"); Julian Seidel; Frank J. Calcara; David P. Cole; Robert Corletta; Edward A. Dacy; Michael Finci; Ronald Freudenheim; Alan S. Kerxton; Benjamin Maisel; Gloria Meyers; James Porter; Anne Sherman (collectively "the First Maryland defendants"); Charles C. Hogg, II; Frances P. Anderson; Leonard Bass; Dennis B. Berlin; Michael A. Deitz; Jerome F. Dolivka; John C. Donohue, Sr.; Henry R. Elsnic; John D. Faulkner; James D. Laudeman; Terry L. Neifeld; George W.H. Pierson; Paul B. Trice; Baltimore County Savings and Loan Association, Inc.; Chevy Chase Savings and Loan Association, Inc.; Cowenton Savings and Loan Association; Fairmount Savings and Loan Association; Madison and Bradford Savings and Loan Association; Parkville Savings and Loan Association; and Sharon Savings and Loan Association (collectively "the MSSIC defendants") (Paper No. 1).

Plaintiffs filed this action individually and on behalf of a class consisting of all persons who, as of August 23, 1985, had money deposited in First Maryland Savings and Loan (*id.*). The action has been dismissed voluntarily as against defendants Sharon Savings and Loan Association (Paper No. 52) and First Maryland (Paper No. 55).[1]

Pending are the motions to dismiss of the following defendants: Parkville (Paper No. 30); Meyers (Paper No. 31); Chevy Chase (Paper No. 32); Finci and Corletta (Paper Nos. 33 & 36); Baltimore County, Cowenton, Fairmount, and Madison and Bradford Savings and Loans ("the Savings and Loan Group") (Paper No. 34); Anderson, Bass, Dietz, Dolivka, Donohue, Elsnic, Faulkner, Laudeman, Neifeld, and Pierson (Paper No. 35); Trice (Paper No. 37); Seidel (Paper

---

**1.** The first motion to dismiss filed herein was filed by First Maryland. Although First Maryland has been dismissed voluntarily, several other defendants have adopted several of First Maryland's arguments by reference. Consequently, the Court will refer to arguments and exhibits of the First Maryland motion. These papers are still a part of the record in this case.

No. 38); Sherman (Paper No. 39); Calcara (Paper No. 41); Hogg (Paper No. 42); and Kerxton (Paper No. 51). Plaintiffs have responded (Paper No. 54). Replies have been filed by the following defendants: the Savings and Loan Group (Paper No. 56); Chevy Chase (Paper No. 57); MSSIC directors (Paper No. 58); and Parkville (Paper No. 59). No hearing is necessary to decide these motions. Local Rule 6(G), D.Md.

## II.

### A. *Factual Background*

As most people in this State are aware, some more painfully so than others, in May 1985, rumors of the financial instability of two savings and loans—Old Court Savings and Loan and Merritt Savings and Loan— caused runs on those two institutions. Both Old Court and Merritt were insured by the Maryland Savings-Share Insurance Company ("MSSIC"). On May 13, 1985, conservators were appointed for Old Court and Merritt.

On May 14, 1985, Governor Hughes issued an Executive Order declaring a state of public crisis and emergency. That order, *inter alia*, limited withdrawals from all MSSIC-insured associations to a maximum of $1,000.00 per account, per 30-day period. On May 21, 1985, that order was amended to provide for additional withdrawals under certain conditions. The restrictions applied to over 100 MSSIC-insured institutions, including First Maryland.

### B. *The Legislative and Judicial Framework*

With the onset of the crisis, Governor Hughes called the Maryland General Assembly into a special session to enact and amend legislation to respond to the crisis. The special session lasted from May 17, 1985 to May 28, 1985. At that session, eleven bills were enacted regarding the savings and loan crisis. The descriptions of the purposes of some of those bills are as follows.

## CHAPTER 1

### (Senate Bill 1)

AN ACT concerning

Savings and Loan Associations—Governor's Emergency Powers

FOR the purpose of authorizing the Governor in emergency situations, by executive order, to take certain action regarding savings and loan associations under certain circumstances; establishing procedures for legislative review; providing for the termination of this authority; ratifying and confirming certain action; requiring certain fees to be waived and prohibiting certain information from being recorded on a person's credit record; providing for the construction of this Act; providing for certain penalties; making this Act an emergency measure;

1985 Md.Laws, 1st Sp.Sess., ch. 1.

## CHAPTER 2

### (House Bill 2)

AN ACT concerning

Savings and Loan Associations—Conservatorship—Receivership

FOR the purpose of altering the conditions under which the court may appoint a conservator of a savings and loan association; altering and expanding the powers of a conservator of a savings and loan association; altering the conditions under which the court may appoint a receiver for a savings and loan association; making this Act an emergency measure; ...

1985 Md.Laws, 1st Sp.Sess., ch. 2.

## CHAPTER 4

### (House Bill 4)

AN ACT concerning

Creation of a State Debt—Savings and Loan Association Capital Stabilization and Insurance Loan

FOR the purpose of authorizing the creation of a State Debt in the amount of $100,000,000, the proceeds to be used for the purpose of providing monies for the Savings and Loan Association Capital Stabilization Fund created un-

der this act and the Maryland Deposit Insurance Fund; providing for the creation of the Savings and Loan Association Capital Stabilization Fund, the composition of the Fund, and the management, supervision, and application of the Fund; ...

### Preamble

WHEREAS, Public confidence in the security of deposits in privately insured savings and loan associations has been severely eroded by recent events in Ohio; and

WHEREAS, The events in Ohio have led to heightened sensitivity in Maryland to the fiscal integrity and financial stability of privately insured savings and loan associations; and

WHEREAS, Two major State-chartered, privately insured savings and loan associations are under court ordered conservatorships; and

WHEREAS, These events and the consequent erosion of public confidence have led to the proclamation by the Governor of an emergency sufficiently grave to require his directing that withdrawals by depositors be limited to an aggregate $1,000 per account in each 30 consecutive day period commencing May 14, 1985, from any association insured by the Maryland Savings-Share Insurance Corporation not in conservatorship; and

WHEREAS, The General Assembly has been called into Special Session to alleviate the impending financial crisis; and

WHEREAS, The continued fiscal integrity and financial stability of the thrift industry in Maryland is a vitally important concern to the State and all of its citizens; and

WHEREAS, The events in Maryland have been reported adversely to have affected the value of the United States dollar in international money markets; and

WHEREAS, Both the fiscal reputation of the government of the State of Maryland, including its ability in the future to finance vitally needed public projects and programs through ready access to the financial markets, may be adversely affected unless decisive action is taken to restore public confidence; and

WHEREAS, The General Assembly hereby declares that a condition of public crisis and emergency exists in the State of Maryland and that the following enactment is necessary to protect the public safety, health, and welfare, to control the state of emergency, and to restore public confidence in, and the fiscal integrity and financial stability of, the thrift industry throughout Maryland; ...

1985 Md.Laws, 1st Sp.Sess., ch. 4.

The General Assembly was called into a second special session on October 17, 1985. That session lasted until November 5, 1985. Of the eight acts passed in that session, four involved savings and loans. *See* 1985 Md.Laws, 2d Sp.Sess., chs. 3–6. In the 1986 legislative session, the Financial Institutions Article of the Maryland Code was further amended. *See* 1986 Md.Laws, chs. 11 & 12.

One of the most important results of these legislative efforts was the creation of the Maryland Deposit Insurance Fund ("MDIF"). *See Md.Fin.Inst.Code Ann.* § 10–102; 1985 Md.Laws, 1st Sp.Sess., ch. 6, § 3. The provisions of Title 10 of the Financial Institutions Article establish and define the structure and powers of the MDIF. *Md.Fin.Inst.Code Ann.* §§ 10–101 —10–121. Subtitle Seven of Title Nine of the Financial Institutions Article, as amended in the 1986 session, provides an extensive framework for the appointment and administrative powers of a conservator or receiver. *Md.Fin.Inst.Code Ann.* §§ 9–701—9–712.

Of particular pertinence to this case are § 9–709, which provides for MDIF or the Federal Deposit Insurance Corporation to be appointed as conservator or receiver, and §§ 9–710 and 9–711, which provide for the jurisdiction and powers of the Maryland circuit court in administering the conservatorship or receivership.

Section 9–710 provides as follows:

§ 9–710. Jurisdiction of circuit court.

(a) *In general.*—(1) Notwithstanding any other provision of law and to the maximum extent permitted under the federal and State constitutions, the circuit court administering a conservatorship or receivership under this title shall have exclusive and plenary jurisdiction over all claims, actions, and proceedings that are brought by any person and that are related to the assets, property, powers, rights, privileges, duties, and liabilities of:

(i) The savings and loan association and its subsidiaries, affiliates, or holding company;

(ii) The receivership or conservatorship estate; and

(iii) The State of Maryland Deposit Insurance Fund Corporation in its capacity as receiver or conservator of the savings and loan association.

(2) A court other than a court administering a conservatorship or receivership under this title may exercise jurisdiction over claims and actions if:

(i) The court would have jurisdiction over the claims or actions but for this section; and

(ii) The court administering the conservatorship or receivership approves:

1. The initiation and prosecution, or the continued prosecution, of the claims or actions in the other court by the conservator or receiver; or

2. The continued prosecution of claims or actions in the other court by any person other than the conservator or receiver.

(b) *Transfers.*—Except as otherwise ordered by the court administering the conservatorship or receivership, any action or proceeding described in subsection (a)(1) of this section that is pending at the time the conservatorship or receivership is established under this title shall be transferred to the circuit court administering the conservatorship or receivership. (1986, ch. 11, § 2.)

§ 9–711 provides as follows:

§ 9–711. Powers of circuit court in administering conservatorship or receivership.

(a) *In general.*—The circuit court administering a conservatorship or receivership under this title has full power to approve and allow or to reject and disallow claims against the conservatorship or receivership estate.

(b) *Allowances in receivership.*—In a receivership, the court administering the receivership may estimate for purposes of allowance:

(1) Any contingent, unliquidated, unmatured, or disputed claim, the fixing, liquidation, maturation, or settlement of the dispute of which would delay the administration of the receivership; or

(2) Any right to payment arising from a right to an equitable remedy for breach of performance.

(c) *Reconsideration of claims.*—(1) In a conservatorship or receivership, a court may reconsider for cause according to the equities of the case a claim that has been allowed or disallowed.

(2) A reconsideration under this subsection:

(i) Must be filed within 60 days from the date of the court's initial determination; and

(ii) Does not affect the validity of any payment or transfer from the receivership estate that is made to a holder of an allowed claim on account of the allowed claim that is not reconsidered.

(3) This subsection does not alter or otherwise prejudice the right of the conservator or receiver to recover any excess payment or transfer made to a creditor. (1986, ch. 11, § 2.)

The Court of Appeals of Maryland has appointed one judge, Judge Joseph H.H. Kaplan, of the Circuit Court for Baltimore City, to adjudicate all disputes arising out of the receivership/conservatorship proceedings.

C. *The First Maryland Conservatorship and Receivership*

On November 20, 1985, Judge Kaplan, finding that First Maryland was in an impaired condition, appointed MDIF as conservator for First Maryland. Shortly after

this appointment, most of the members of the board of directors, including Julian Seidel, Chairman of the Board and President of First Maryland, resigned. MDIF then brought in outside bankers and real estate lenders to oversee the daily management of First Maryland. The conservatorship team's responsibilities were to preserve and protect First Maryland's assets and to attempt to locate a buyer for the institution.

All decisions relating to the structuring of loans, the disposition of assets, and the handling of accounts have been submitted to Judge Kaplan for his approval. In the conservatorship order, Judge Kaplan fixed the interest rates on all depositors' accounts at 5½ per cent per annum, with an exception for certain certificates of deposit maturing after the date of the order (*see* Paper No. 21.5 at ¶ 7).

On December 11, 1985, the Maryland Savings and Loan Depositors' Committee, a group of individuals who are depositors in various Maryland savings and loan associations, consisting of approximately 1,500 members, of which at least 100 members have monies on account at First Maryland, filed a motion to intervene in the conservatorship proceeding. On January 16, 1986, Judge Kaplan granted the motion to intervene. Since then, counsel for the Depositors' Committee has received copies of pleadings and has been afforded an opportunity to be heard on all matters affecting depositors.

On March 14, 1986, MDIF, as conservator for First Maryland, filed suit against certain former officers and directors of First Maryland for breach of fiduciary duty, fraud, conspiracy, negligence, waste, conversion, and other related claims (Paper No. 24, Exh. D). The allegations contained in the complaint in that action are strikingly similar to the allegations contained in the amended complaint in this case. (See Appendix hereto.)

There evidently not being a great demand in the marketplace for failing Maryland savings and loan associations, MDIF was unable to arrange a buyer for First Maryland. On June 19, 1986, MDIF petitioned for an order appointing MDIF as receiver for First Maryland. By order dated June 19, 1986, Judge Kaplan, finding that First Maryland was in an impaired or insolvent condition and that it was unwise to return the management of First Maryland to its former board of directors, ordered that MDIF be appointed receiver for First Maryland (*see* Paper No. 24, Exh. E). Paragraph 4 of the receivership order terminated the continuing accrual of interest on First Maryland accounts by declaring that all depositors' accounts, including certificates of deposit, were deemed to have matured on the effective date of the order. No appeal was filed from that order.

Pursuant to the receivership order, MDIF has taken steps to liquidate First Maryland assets for distribution to depositors and creditors. The first distribution, totalling approximately $70 million, up to $1,500 per depositor, was made pursuant to the Governor's General Distribution Plan. The money for that distribution was provided from state funds, with the understanding that the funds eventually would be reimbursed through the liquidation of assets. Later, approximately $41 million generated through the sale of First Maryland assets was distributed, in December, 1986, on the basis of 15 per cent of the balance of each First Maryland account. Judge Kaplan has supervised all distributions, and as additional First Maryland assets are sold, Judge Kaplan will supervise the distributions of the proceeds.

### D. *The Two Lawsuits*

In this action, plaintiffs seek compensatory, treble, and punitive damages, as well as attorneys' fees, from individual former First Maryland directors, individual former MSSIC directors, and the savings and loan associations for which the former MSSIC directors are or were employed. The plaintiffs' damage theory is that the plaintiffs have been deprived of the use of their money and have been deprived of interest on their money. Plaintiffs allege that the July 31, 1985 return of principal, up to $5,000 per depositor, did not compensate the depositors for any lost interest. Plain-

tiffs further allege that prior to the receivership, there was an interest ceiling of 5½ percent, as described *ante,* and that no interest has accrued since First Maryland was placed in receivership (Paper No. 21.5 at ¶¶ 103–104).

As stated *ante,* the decisions relating to the interest on the First Maryland accounts were made by Judge Kaplan pursuant to his statutory authority in overseeing this crisis. Thus, the plaintiffs have initiated this action to attempt to circumvent, and attack collaterally, Judge Kaplan's conservatorship and receivership orders, as well as his approval of the initial $5,000 per customer payout, and to recover attorneys' fees under 18 U.S.C. § 1964(c).

■ Comparison of this action with *MDIF v. Seidel,* No. 13408 (Cir. Ct. for Mont. Co., Md., filed Mar. 14, 1986), the pending action brought by the receiver in the state court, makes it clear that this action is one of the types of actions intended to be covered by *Md.Fin.Code Ann.* § 9–710. Although § 9–710 does not expressly mention suits against former directors, the broad language of that section must be read to include such suits.

In the state action, MDIF and First Maryland Savings and Loan are the plaintiffs. MDIF is a plaintiff in its capacity as receiver (conservator at the time the action was filed). The plaintiffs in the instant action consist of a putative class of all persons who, as of August 23, 1985, had money deposited with First Maryland. In the state case, the Maryland Savings and Loan Depositors' Committee, a group of depositors, has intervened. That group represents the same interests as the plaintiffs herein. In fact, by definition, some of the putative class members must necessarily be included in the Depositors' Committee.

The factual allegations against the former First Maryland directors in the two cases are, as stated *ante,* strikingly similar (*see* Comparison of Amended Complaint in this Action with Original Complaint in *MDIF v. Seidel,* Attached hereto as Appendix).

The legal theories of the two cases, other than the RICO claim itself, are virtually identical. In the state action MDIF has sued under theories of negligent and intentional breach of fiduciary duty, fraud, breach of contract, civil conspiracy, negligence, gross negligence, waste, conversion, and money due and owing. MDIF is seeking $20 million in compensatory and $25 million in punitive damages. Its suit is, thus, one to recover assets and property of First Maryland and its depositors depleted by the defendants through their allegedly tortious conduct. That suit is within the ambit of § 9–710, because it is related to the assets, property and rights of the savings and loan association, the receivership estate, and MDIF in its capacity as receiver of the savings and loan association. *See* § 9–710(a)(1)(i), (ii), & (iii). In fact, Judge Kaplan has exercised jurisdiction over the case, as prescribed by § 9–710(a).

In the instant action, the plaintiffs are suing under civil RICO, and under the common law theories of fraud, negligent and intentional misrepresentation, conspiracy, conversion, breach of contract, negligence, gross negligence and breach of fiduciary duties.

This suit also falls within the provisions of § 9–710. It is related to the assets, property, powers, rights, privileges, and liabilities of First Maryland and its receivership estate, because any recovery in this action will obviously decrease the amount of funds available from the defendants to replenish the assets of the savings and loan that allegedly have been wrongfully appropriated or disbursed by them. The defendants can only have a finite amount of money. After it is gone, the savings and loan and its receivership estate will not be able to get blood from the turnips that remain. This federal suit will obviously relate to the performance of MDIF's duties as receiver, because it will interfere with MDIF's attempts to recover against the defendants in state court. The instant federal action, therefore, is of the general type covered by the broad language of § 9–710.

The various defendants argue numerous grounds for dismissal. The Court first will address the sufficiency of the RICO claims against each of the two groups of defend-

ants—the First Maryland defendants and the MSSIC defendants.

## III.

A comparison of the claims against the First Maryland defendants with the claims against the MSSIC defendants illustrates the difference between a claim setting forth a pattern of racketeering and one merely alleging one limited scheme or plan.

### A.  *The Civil RICO Law*

In *Sedima, S.P.R.L. v. Imrex Co.*, ["*Sedima*"], 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), the Supreme Court reversed the Second Circuit, holding that (1) there is no requirement that a private action can proceed only against a defendant who has already been convicted of a predicate act or a RICO violation, and (2) there is also no requirement that a plaintiff in a private action establish a "racketeering injury" as opposed to an injury resulting from the predicate acts themselves.  Justice White explained that, to state a claim, the plaintiff must simply allege the elements of the particular § 1962 violation claimed.  *Id.* 105 S.Ct. at 3285.  Here, plaintiffs are thus required to allege (1) acquisition or maintenance (2) of an enterprise (3) through a pattern (4) of racketeering.  Justice White gave a thorough, yet succinct, explanation of the "pattern of racketeering" requirement, writing:

> As many commentators have pointed out, the definition of "pattern of racketeering activity" differs from the other provisions in § 1961 in that it states that a pattern *"requires* at least two acts of racketeering activity," § 1961(5) (emphasis added), not that it "means" two such acts.  The implication is that while two acts are necessary, they may not be sufficient.  Indeed, in common parlance two of anything do not generally form a "pattern."  The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern.  As the Senate Report explained:  "The target of [RICO] is thus not sporadic activity.  The infiltration of legitimate business normally requires more than

one 'racketeering activity' and the threat of continuing activity to be effective.  It is this factor of *continuity plus relationship* which combines to produce a pattern."  S.Rep. No. 91–617, p. 158 (1969).

*Id.* 105 S.Ct. at 3285 n. 14 (emphasis in original).

The Fourth Circuit recently has clarified its interpretation of the "pattern of racketeering" requirement, in light of the *Sedima* opinion.  *International Data Bank, Ltd. ["IDB"] v. Zepkin*, 812 F.2d 149 (4th Cir.1987).  There, International Data Bank, Ltd. sued Zepkin and one Grossman, claiming that a certain prospectus distributed to 10 investors included a fraudulent statement in violation of federal securities laws, and it sought treble damages and attorneys' fees for violation of RICO.  *Id.* at 150.  The district court dismissed the suit, and the Fourth Circuit affirmed that dismissal, holding that International Data Bank, Ltd. lacked standing to sue, and also that it had failed to plead facts satisfying the "pattern of racketeering" requirement.  *Id.*  The Fourth Circuit fleshed out this requirement in *IDB*, relying heavily on *Sedima* and the "continuity plus relationship" language therein.  Most importantly, the Court stated that the "predicate acts must be related and must be a part of a continuous criminal endeavor," *id.* at 154, and that "no mechanical test can determine the existence of a RICO pattern."  *Id.* at 155.  The Fourth Circuit concluded in *IDB* that "what constitutes a RICO pattern is ... a matter of criminal degree," and cautioned that "[t]o allow a pattern of racketeering' to flow from a single, limited scheme ... would undermine Congress' intent that RICO serve as a weapon against ongoing activities whose scope and persistence pose a special threat to social well-being."  *Id.*

The court in *IDB* also stated that the "pattern of racketeering activity" requirement was intended to limit civil RICO to "those cases in which racketeering acts are committed in a manner characterizing the defendant as a person who regularly commits such crimes."  *Id.* (quoting *Lipin En-*

*terprises, Inc. v. Lee,* 803 F.2d 322, 324 (7th Cir.1986)).

### B. *The First Maryland Defendants*

The Amended Complaint alleges, *inter alia,* the following self-dealing activities on the part of the First Maryland defendants:

More particularly, as to self-dealing, the First Maryland Defendants fraudulently and deceitfully withheld from the public, including plaintiffs and class members, material facts including but not limited to knowledge that:

(a) Directors Associates Limited Partnership, whose partners included defendants Julian Seidel, Frank J. Calcara, Robert Corletta, Edward A. Dacy, Michael Finci, Benjamin Maisel, Gloria Meyers, and James Porter (and a partnership partly owned by defendant David P. Cole) received a $186,000 (now delinquent) loan from First Maryland, at a rate *below* the then-prevailing cost of funds to First Maryland. The partnership subsequently received another $85,000 loan from First Maryland, on which no payments whatsoever were made so long as the defendants controlled First Maryland. In addition, Director Associates Limited Partnership owned in whole or in part "East 86th Street," which received a $7,000,000 loan from First Maryland;

(b) Unsecured loans were made to officers and directors, including Ronald Freudenheim, Alan S. Kerxton, James Porter, and James J. Smat, in violation of Section 9–307(b) of the Maryland Code;

(c) Vermont Avenue Limited Partnership, whose partners included defendants Julian Seidel, Frank Calcara, Michael Finci, Ronald Freudenheim, and James Porter, received a $801,200 loan from First Maryland, without required State approval;

(d) Liberty Towers Limited Partnership, whose partners included defendants Julian Seidel and Edward A. Dacy (as well as Vee M. Bundy, who owned 20% of First Maryland's stock), received a $1,750,000 loan from First Maryland, without an appraisal on the property serving as security, and without required State approval;

(e) Indiana Avenue, in which defendant Julian Seidel and other First Maryland insiders owned interests, received a $4,500,000 loan from First Maryland;

(f) Battery Lane Limited Partnership, in which defendant Julian Seidel owned an interest, received a $105,000 loan from defendant First Maryland;

(g) Palmer Highway General Partnership, in which defendant Alan S. Kerxton owned an interest, received a $500,000 loan from First Maryland;

(h) Loan procurement fees were improperly paid to Vee M. Bundy, who owned 20% of First Maryland's stock;

(i) Extravagant salaries, fees and other remuneration in excess of industry standards and prudent practice, were paid to officers and directors of First Maryland, and their relatives;

(j) Defendant Ronald Freudenheim solicited and received kickbacks from borrowers, including a washer and dryer, home improvements and at least $43,000 in cash, and although First Maryland's Board of Directors was informed of the cash kickbacks by the association's internal auditor, it took no action to terminate his employment or limit his authority.

(Paper No. 21.5 at 26–28) (emphasis in original).

■ These allegations, if proved, establish a "pattern of racketeering" as defined by *Sedima* and *IDB,* constituting more than a single limited scheme, and one that does involve criminal conduct so high in degree as to pose a special threat to social well-being. Plaintiffs allege that the defendants established five limited partnerships and one general partnership, authorized and/or accepted several allegedly illegal personal loans, paid themselves extravagant fees and salaries, and solicited and received kickbacks.

As alleged, the facts establish a relationship—the use of First Maryland to accomplish the acts—and continuity—several distinct self-dealing schemes, carried out with no regard for the duty owed to depositors.

The degree of criminal activity alleged here is more than just that of a limited scheme or single plan. The number of acts and the continued use of First Maryland to carry out these acts implies that, if the facts are proved, the acts committed are such that they characterize the defendants as people who regularly commit such acts. From the allegations it seems that the only thing that stopped the actions was the fact that the principals got caught. The alleged facts imply that had the crisis not occurred, the defendants never would have ceased these actions.

The Amended Complaint states a civil RICO cause of action against the First Maryland defendants.

### C. *The MSSIC Defendants*

■ The allegations concerning the MSSIC defendants do not state a civil RICO cause of action. Most of the allegations center around the MSSIC defendants' alleged negligent or grossly negligent failure to carry out their duty as overseers of the savings and loan associations (*See* Paper No. 21.5 at ¶¶ 58–80). One paragraph of the Amended Complaint exemplifies these allegations as follows:

Rather than utilize their power and position to correct the unsafe and unsound practices in member institutions, the MSSIC defendants conspired to permit and permitted these practices to continue, thereby increasing and escalating the danger to the MSSIC system and depositors. In fact, some of the MSSIC defendants' actions actually increased the risk to the system and the public. As the examples set forth in the following paragraphs make clear, the MSSIC defendants failed to discharge their responsibilities to MSSIC in at least the following ways....

(*id.* at ¶ 80).

The Amended Complaint also contains allegations of fraudulent and misleading advertising activities on the part of MSSIC. Those alleged activities included misleading radio, television and print media ads regarding the security of savings at MSSIC institutions (*id.* at ¶ 81(a)); distribution of a brochure entitled "We Have the Answers," which allegedly created the misimpression that MSSIC was a Maryland state agency (*id.* at ¶ 81(b)); distributing on a regular basis letters entitled "An Open Letter to a Potential MSSIC Saver" (*id.* at ¶ 81(c)); responding to telephone and written inquiries from savers by assuring them of the security of their savings in MSSIC member institutions (*id.* at ¶ 81(d)); permitting member institutions to advertise in the print media in such a way as to create the misimpression that the institutions were insured by the State of Maryland (*id.* at ¶ 81(e)); issuing "Advertising Guidelines" directing member institutions to use the MSSIC seal in print media and broadcast advertising, which seal was deceptively similar to that of the State of Maryland (*id.* at ¶ 81(f)); pursuing an explicit policy of concealing from publication adverse information about member institutions (*id.* at ¶ 81(g)); and deliberately misrepresenting the nature and value of the "insurance" offered by MSSIC (*id.* at ¶ 84).

■ These allegations do not set forth the type of continuous criminal endeavor that will establish a pattern of racketeering as defined in *Sedima* and *IDB*. The acts alleged constituted but one scheme, *viz.*, to portray falsely the security of MSSIC savings through the use of a misleading seal and misleading advertisements and other marketing ploys. Although the activities continued over time, they lack the requisite continuity as that term applies in RICO cases.

The difference between the acts alleged against the MSSIC defendants and those alleged against the First Maryland defendants is one of continuity, as well as criminal degree. The First Maryland allegations create the image of a group of people using an enterprise (the savings and loan association) to carry out whatever criminal or fraudulent acts they could. Theirs was not just a one-time plan to accomplish a single goal. The MSSIC allegations, however, create the image of 1) negligent or grossly negligent failure to oversee the thrifts; and 2) one fraudulent scheme, *viz.*, to encourage depositors to deposit in any

and all MSSIC thrifts by portraying deposits in those thrifts as more secure than they actually were. Although the amended complaint alleges various acts involving the MSSIC defendants, those acts were all in furtherance of the one limited scheme.

The MSSIC claims are no more than ordinary claims of fraud, if that, which are best left to state law. *IDB*, 812 F.2d at 155 (citing *Sedima*, 105 S.Ct. at 3293 (Marshall, J. dissenting)). The civil RICO count against the MSSIC defendants, therefore, must be dismissed for failure to state a claim. Fed.R.Civ.P. 12(b)(6). Consequently, the pendent state law claims also must be dismissed as against the MSSIC defendants. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

## IV.

Several of the defendants have suggested that this Court abstain from hearing this case under the doctrines set forth in *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424, *reh. denied*, 320 U.S. 214, 63 S.Ct. 1442, 87 L.Ed. 1851 (1943), and/or *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 *reh. denied*, 426 U.S. 912, 96 S.Ct. 2239, 48 L.Ed.2d 839 (1976). Two savings and loan cases in this Court have been dismissed on both *Burford* and *Colorado River* abstention grounds. *American Casualty Company v. Community Savings and Loan, Inc.*, 635 F.Supp. 539 (D.Md.1986); *Northern Virginia Law School, Inc. v. Hughes*, No. B–85–3200 (D.Md. Nov. 22, 1985). In another case, former Judge Miller of this Court, while dismissing a savings and loan-related case on other grounds, stated strongly in dicta that *Burford* abstention would be appropriate in such cases. *See Community Savings & Loan, Inc. v. Citibank, N.A.*, No. M–85–4005 (D.Md. October 10, 1985).

The plaintiffs suggest that this case is distinguishable from those cases, in that this case involves a federal question claim, civil RICO, which the plaintiffs argue is a claim within exclusive federal jurisdiction.

This Court will address the *Burford* and *Colorado River* doctrines separately.

### A. *The Burford Abstention Doctrine*

■ Under *Burford*, a federal district court should abstain from exercising jurisdiction where the exercise of jurisdiction would result in needless federal-state friction caused by federal interference with state administration of purely local affairs. 319 U.S. at 332, 63 S.Ct. at 1106; *Ad+Soil Services, Inc. v. Board of County Commissioners*, 596 F.Supp. 1139, 1141 (D.Md. 1984). In arguing for abstention, defendants reason that the exercise of federal jurisdiction in this case will interfere with Maryland's regulatory scheme relating to savings and loan associations, enacted as an emergency response to the savings and loan crisis.

Plaintiffs' initial argument in response is that in this case, "no specialized state court has been given exclusive jurisdiction over any 'particularly complex resource regulation.'" (Paper No. 54 at 52). Plaintiffs' argument is flawed both factually and legally. Analysis of two recent Fourth Circuit cases illustrates the legal flaw.

In *Educational Services, Inc. ["ESI"] v. Maryland State Board for Higher Education*, 710 F.2d 170 (4th Cir.1983), a case cited by the plaintiffs, the Fourth Circuit reversed the district court's decision to abstain. There, ESI had filed a broad-ranging and intricate constitutional challenge to Maryland's certification process governing the operation of a private teacher-training school. *Id.* at 171.

In addressing the *Burford* abstention issue, the court wrote as follows:

The salient factor in *Burford* was that, in addition to state regulation of a field, "the State had established its own elaborate review system for dealing with the geological complexities of oil and gas fields" by concentrating judicial oversight in specially authorized state courts.... Review by a federal court— or, indeed by any unspecialized state court—of the administrative actions questioned in *Burford* "would have had an impermissibly disruptive effect on

state policy for the management of those fields." ... The premise underlying the *Burford* doctrine is that the very act of review by a court other than the one purposely made familiar with the particularly complex resource regulation issues involved would upset a carefully crafted and integrated system.

710 F.2d at 173 (citations omitted). The Fourth Circuit reasoned that, although state educational regulation is of an important and sensitive nature to the states, the Maryland courts did not stand in any "special relationship of technical oversight or concentrated review to the educational certification procedure the way the Texas or Alabama resource review courts did in *Burford* and *Alabama [Public Service Commission v. Southern Railway Co.,* 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951) ]." *Id.*

In the slightly more recent case of *Browning-Ferris, Inc. ["BFI"] v. Baltimore County, Maryland,* 774 F.2d 77 (4th Cir.1985), the Fourth Circuit held that the district court had correctly abstained under *Burford.* There, BFI, the owner of a landfill in Baltimore County, Maryland, filed an action under 42 U.S.C. § 1983, claiming that state and county officials arbitrarily and capriciously had refused to renew BFI's refuse disposal permit.

The Fourth Circuit's reasoning was twofold: 1) the case involved a complex regulatory scheme concerning important matters of state interest; and 2) land use questions are the particular concern of local and state government. *Id.* at 79.

BFI argued there, as the plaintiffs argue here, that no specialized state courts had exclusive jurisdiction over the matters. *Id.* The Fourth Circuit rejected this argument, reasoning that Maryland statutes and regulations contain a complex regulatory scheme governing the operation of landfills. *Id.* The court also recognized that the statutes recognized a distinct state legislative policy. *Id.*

In light of *BFI,* it cannot be said that there is a requirement that a specific court be granted exclusive jurisdiction over the matters. As the court there wrote:

[T]he purpose of *Burford* abstention is to prevent federal courts from interfering with "a complex state regulatory scheme concerning important matters of state policy for which impartial and fair administrative decisions subject to expeditious and adequate judicial review are afforded."

*Id.* (quoting *Aluminum Co. v. Utilities Commission of North Carolina,* 713 F.2d 1024, 1029 (4th Cir.1983), *cert. denied,* 465 U.S. 1052, 104 S.Ct. 1326, 79 L.Ed.2d 722 (1984)).

Plaintiffs' argument is also factually flawed. Pursuant to the statutory scheme enacted in the special session and the order of the Court of Appeals of Maryland, all cases arising out of savings and loan association conservatorship and receivership proceedings are assigned not only to one court, but to one judge. That is about as exclusive as jurisdiction can be.

Plaintiffs next argue that defendants have not identified any way in which this litigation could impair the state's efforts to effect its policies. The main objective of this suit is to recover interest the plaintiffs are not receiving because of Judge Kaplan's receivership order. If the plaintiffs are allowed to proceed with this cause of action, plaintiffs will have circumvented Judge Kaplan's order. This would set a precedent that could totally undermine Judge Kaplan's authority in handling claims arising out of the crisis. Additionally, this suit could reduce the funds available to satisfy any judgment rendered by Judge Kaplan. This court cannot conceive of a situation in which the exercise of federal jurisdiction could further impair a state's efforts to effect an important policy dealing with a matter of purely local interest. The integrity of state court decisions and processes by which those courts compel compliance therewith is extremely important to the states. *See Pennzoil Co. v. Texaco, Inc.,* —— U.S. ——, ——, 107 S.Ct. 1519, 1526, 95 L.Ed.2d 1 (1987); *Juidice v. Vail,* 430 U.S. 327, 335, 97 S.Ct. 1211, 1217, 51 L.Ed.2d 376 (1977). Where such processes are directly challenged in actions in federal courts, the Supreme Court has held

that abstention is appropriate under *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). *See Pennzoil,* —— U.S. at —— – ——, 107 S.Ct. at 1525–27; *Juidice*, 430 U.S. at 335–36, 97 S.Ct. at 1217–18. Where, as here, those processes are attempted to be circumvented by means of a suit in the federal courts, there certainly exists a high degree of interference with state efforts. Plaintiffs' action interferes with both the state interest of policing its own thrift industry crisis and with the state's arm for policing that crisis—its appointed court.

Plaintiffs next argue that *Burford* abstention is improper because no injunctive relief is sought, only damages. Although the abstention doctrines have their origins in cases involving the exercise of federal equitable jurisdiction, those cases "did not apply a technical rule of equity procedure. They reflect a deeper policy derived from our federalism." *Louisiana Power & Light Co. v. Thibodaux*, 360 U.S. 25, 28, 79 S.Ct. 1070, 1072, 3 L.Ed.2d 1058 *reh. denied*, 360 U.S. 940, 79 S.Ct. 1442, 3 L.Ed.2d 1552 (1959).

■ In *Thibodaux*, the Supreme Court held that abstention was proper in an eminent domain case. Recognizing that such suits are suits at common law, the Court reasoned that "[t]he considerations that prevailed in conventional equity suits for avoiding the hazards of serious disruption by federal courts of state government or needless friction between state and federal authorities are similarly appropriate in a state eminent domain proceeding brought in, or removed to, a federal court." *Id.* Abstention also has been ordered in other suits at law without discussion of this issue. *See, e.g., Fornaris v. Ridge Tool Co.*, 400 U.S. 41, 91 S.Ct. 156, 27 L.Ed.2d 174 (1970); *United Gas Pipe Line Co. v. Ideal Cement Co.*, 369 U.S. 134, 82 S.Ct. 676, 7 L.Ed.2d 623 (1962). This Court is aware of one district court that has decided that abstention is improper in an action where damages are sought. *See Liberty Curtain Concerned Parents v. Keystone Central School District*, 81 F.R.D. 590, 597 (M.D. Pa.1978). In light of the above Supreme

Court cases, however, that case is not persuasive. This Court holds that abstention may be proper in an action at law.

As in *Thibodaux*, the prevailing considerations of avoiding federal court disruption of state government and avoiding needless friction between state and federal authorities are equally appropriate where a litigant attempts to employ a federal statute to circumvent the rulings of a state judge.

Plaintiffs finally argue that abstention is improper here, because the federal court's jurisdiction over RICO claims is exclusive. Plaintiffs' argument is unconvincing for two reasons: first, this Court does not believe that Congress has restricted jurisdiction over RICO claims exclusively to the federal courts; and second, exclusive jurisdiction, while a factor to be weighed heavily in abstention cases, should not prevent abstention in such a compelling case as this one.

■ Plaintiffs argue that the "heavy weight of authority finds exclusive federal jurisdiction over RICO." (Paper No. 54 at 53 n. 37). This is not true. There has been a diametric split among the federal district courts and state courts that have addressed the issue. The group of cases cited by the plaintiffs holds that federal jurisdiction is exclusive. *Broadway v. San Antonio Shoe, Inc.*, 643 F.Supp. 584 (S.D.Tex.1986); *Nordberg v. Lord, Day & Lord*, 107 F.R.D. 692, 701 (S.D.N.Y.1985); *County of Cook v. Midcon Corp.*, 574 F.Supp. 902 (N.D.Ill. 1983), *aff'd on other grounds*, 773 F.2d 892 (7th Cir.1985); *Ideal Stencil Machine & Tape Co. v. Merchiori*, 600 F.Supp. 185, 190 (S.D.Ill.1985); *Greenview Trading Co. v. Hershman & Leicher, P.C.*, 108 A.D.2d 468, 489 N.Y.S.2d 502 (1985).

An equally numerous group of cases cited by the defendants holds that jurisdiction is concurrent. *Contemporary Services Corp. v. Universal City Studios*, 655 F.Supp. 885 (C.D.Cal.1987); *HMK Corp. v. Walsey*, 637 F.Supp. 710, 717 (E.D.Va. 1986); *Carman v. First National Bank*, 642 F.Supp. 862 (W.D.Ky.1986); *Karel v. Kroner*, 635 F.Supp. 725, 729–31 (N.D.Ill. 1986); *Charles Kurz Co. v. Lombardi*, 595 F.Supp. 373, 381 n. 11 (E.D.Pa.1984);

*Luebke v. Marine National Bank,* 567 F.Supp. 1460, 1462 (E.D.Wis.1983); *Cianci v. Superior Court,* 40 Cal.3d 903, 916, 221 Cal.Rptr. 575, 581, 710 P.2d 375, 376–82 (1985).[2]

An analysis of these sets of cases, in light of the Supreme Court case of *Gulf Offshore Co. v. Mobile Oil Co.,* 453 U.S. 473, 101 S.Ct. 2870, 69 L.Ed.2d 784 (1981), leads this Court to the conclusion that RICO jurisdiction is concurrent.

The Supreme Court always has held the general view that state courts may assume subject matter jurisdiction over a case arising under federal law unless Congress explicitly has provided for exclusive jurisdiction or unless there exists some "disabling incompatibility between the federal claim and state court adjudication." *Gulf Offshore,* 453 U.S. at 477–78, 101 S.Ct. at 2874–75 (citing *Charles Dowd Box Co. v. Courtney,* 368 U.S. 502, 507–08, 82 S.Ct. 519, 522–23, 7 L.Ed.2d 483 (1962) and *Claflin v. Houseman,* 93 U.S. (3 Otto) 130, 136, 23 L.Ed. 833 (1876)).

■ In determining whether state courts have jurisdiction over a federal claim, a court must begin with the presumption that state courts enjoy concurrent jurisdiction. 453 U.S. at 478, 101 S.Ct. at 2875. Congress, however, either explicitly or implicitly, may grant exclusive jurisdiction to the federal courts. In other words, "the presumption of concurrent jurisdiction can be rebutted by an explicit statutory directive, by unmistakable implication from legislative history, or by a clear incompatability between state-court jurisdiction and federal interests." *Id.*

There is no explicit statutory directive in RICO limiting jurisdiction to the federal courts. The pertinent language of the statute reads as follows: "Any person ... *may* sue ... in any appropriate United States

district court...." 18 U.S.C. § 1964(c). The use of the term "may" in the statute is not indicative of exclusive jurisdiction. *Charles Dowd Box Co. ["Dowd"] v. Courtney,* 368 U.S. 502, 506, 82 S.Ct. 519, 522, 7 L.Ed.2d 483 (1962).

The legislative history of the statute provides no implication, much less any "unmistakable implication," of exclusive jurisdiction. Indeed, as Professor G. Robert Blakey, one of the principal draftsman of RICO, has stated, " '[t]here is nothing on the face of the statute or in the legislative history that touches on the question of concurrent jurisdiction,'.... 'To my knowledge, no one even thought of the issue.' " *Greenview Trading Co. v. Hershman & Leicher, P.C.,* 108 A.D.2d 468, 489 N.Y.S.2d 502, 505 (1985) (quoting Flaherty, *Two States Lay Claim to RICO,* Nat'l L.J., May 7, 1984, at col. 1).[3]

The cases finding exclusive jurisdiction have done so using several approaches. In *County of Cook v. Midcon Corp.,* 574 F.Supp. 902 (N.D.Ill.1983), *aff'd on other grounds,* 773 F.2d 892 (7th Cir.1985), the district court analyzed the wording and legislative history of § 1964(c) and concluded that jurisdiction was exclusive. *Id.* at 911. The defendants, relying on *Dowd,* argued that the statutory language "Any person ... *may* sue therefor in any appropriate United States district court...." allowed for concurrent jurisdiction. 574 F.Supp. at 912. The district court rejected that argument, holding that the § 1964(c) language was more akin to the language of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15, than to the language of the labor statute at issue in *Dowd.* 574 F.Supp. at 912. The court noted that the Clayton Act long has been recognized as restricting jurisdiction exclusively to the federal courts. *Id.* The court also recognized that Con-

---

**2.** Judge Ramsey of this Court has stated in passing that RICO establishes exclusive jurisdiction in the federal courts. *See Morley v. Cohen,* 610 F.Supp. 798, 822 (D.Md.1985) (citing 18 U.S.C. § 1965(a) (the venue statute)). It does not appear from that opinion, however, that the issue was argued or that Judge Ramsey considered any of the above cases, including *Gulf Offshore v. Mobile Oil Co.*

**3.** Blakey expressed his thoughts that, based on the use of the antitrust laws as a model for RICO and based on the exclusive federal jurisdiction of the predicate offenses, courts could infer an intent to limit jurisdiction to the federal courts. *Id.* These two arguments and cases following them will be discussed *infra.*

gress consciously patterned § 1964(c) after the antitrust act. *Id.* (citing, *e.g.,* 115 Cong.Rec. 6992, 6993 (1969) (statement of Sen. Hruska)).

On appeal, the Seventh Circuit affirmed the district court without ruling on the concurrent jurisdiction issue. In a footnote, however, the appellate court expressed doubt whether the analogy to antitrust law applied by the district court, and by a New York state court, *see Greenview Trading Co. v. Hershman & Leicher, P.C.,* 108 A.D.2d 468, 489 N.Y.S.2d 502 (1985), is sufficiently strong to overcome the presumption of concurrent jurisdiction. 773 F.2d at 905 n. 4 (citing *Sedima, S.P.R.L. v. Imrex Company,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)). This gloss is the only word on the issue from any federal circuit court.

Considering the thrust of the *Sedima* opinion, this Court agrees with the Seventh Circuit. In *Sedima* the Supreme Court rejected the Second Circuit's adoption of an antitrust-type injury requirement. 105 S.Ct. at 3284–87. The Court reasoned that such a requirement contradicted not only "Congress' self-consciously expansive language and overall approach, ... but also ... its express admonition that RICO is to 'be liberally construed to effect its remedial purposes.' " *Id.* at 3286 (quoting Pub.L. 91–442, § 904(a), 84 Stat. 947). The Court continued to note that "[t]he statute's 'remedial purposes' are nowhere more evident than in the provision of a private action for those injured by racketeering activity." *Id.* The court concluded that to adopt the antitrust analogy would create inappropriate obstacles in the way of a potential RICO litigant—obstacles contrary to the legislative intent to create broad remedial measures.

This same logic weighs heavily against exclusive jurisdiction in RICO cases. In *Gulf Offshore,* the Supreme Court, citing a law review article, discussed factors to be considered when determining whether concurrent jurisdiction would raise the spectre of incompatability between state and federal interests. 453 U.S. at 483–84 n. 13, 101 S.Ct. at 2877–78 n. 13 (citing Redish &

Muench, *Adjudication of Federal Causes of Action in State Court,* 75 Mich.L.Rev. 311, 329–35 (1976)). Factors supporting exclusive federal jurisdiction include the desirability of uniform interpretation, the expertise of federal judges in federal law, and the assumedly greater hospitality of federal courts to peculiarly federal claims. *Id.* In *Gulf Offshore,* because the claim at issue was one whose governing rules are borrowed from state law, the Court held that none of the factors supported exclusive federal jurisdiction. 453 U.S. at 484, 101 S.Ct. at 2878.

The portion of the Redish & Muench article cited in *Gulf Offshore* also discussed several factors weighing in favor of concurrent jurisdiction: the filing of a burdensome number of claims under the statute; the need for a greater number of fora for the convenience of the parties; and an area of law in which state courts have gained considerable experience by interpreting state laws. *Redish & Muench, supra,* at 334. That article noted that even where such factors exist, if the federal interests to be protected go beyond those of the parties to the suit, such as in patent and antitrust cases, exclusive jurisdiction may still be proper. *Id.* at 335.

This Court concludes that the factors here not only fail to rebut the presumption of concurrent jurisdiction, but, if anything, further strengthen that presumption.

The strongest factor for exclusivity is the possibility of inconsistent results. The RICO statute's failure to define clearly the phrase "pattern of racketeering" has left room for varying interpretations of that element. In recent years, however, the pattern of racketeering element has been given a more narrow definition. In the *Sedima* case, the Court delineated that it is the factors of *"continuity plus relationship"* that combine to form a pattern. 105 S.Ct. at 3275 n. 14 (emphasis in original). Although the subsequent inferior court interpretations of *Sedima* are not uniform, *see, e.g.,* discussion in *International Data Bank, Ltd. v. Zepkin,* 812 F.2d 149, 154–55 (4th Cir.1987), the courts have agreed that a single, limited scheme will not create the

requisite pattern. *Id.* Any aberrant decision of the state courts is reviewable, upon grant of *certiorari*, by the United States Supreme Court. This Court is of the opinion that the possibility of inconsistent results, although not to be ignored, is insufficient to rebut the presumption of concurrent jurisdiction.

Federal interests were analyzed in *Kinsey v. Nestor Exploration Ltd.—1981A,* 604 F.Supp. 1365, (E.D.Wash.1985), as follows:

> In the instant case, if one views the statutory scheme dealing with RICO broadly, then there are most assuredly indicia militating in favor of exclusivity. See 18 U.S.C. § 1961 (predicate acts defined in terms of substantive federal crime); § 1963 (criminal prosecutions exclusively federal by unmistakable implication); § 1965 (extended venue and process provisions applicable only in federal courts); § 1966 (only United States Attorney empowered to act thereunder); § 1967 (limited to actions involving the United States); and § 1968 (only Attorney General may act thereunder). On the other hand, if one views RICO narrowly, and focuses instead only on the section affording the citizenry a private right of action; *i.e.* § 1964(c), there is absolutely nothing in the statutory language which would direct a conclusion of either exclusivity or concurrence. Nor is such legislative history as is available particularly helpful. See 1970 *Code Cong. & Ad.News,* p. 4007 *et seq.*

*Id.* at 1370. The court further reasoned that it did not make sense to view the civil provisions separately from the criminal ones. *Id.* at 1371. The court then concluded that, given the Congressional intent to halt the expansion of racketeering activity and given that the procedural powers to implement the underlying criminal claims are within the exclusive power of federal authorities, Congress could not have intended to give state courts the power to hear RICO cases. *Id.*

This approach is incorrect for two reasons: the *Sedima* case has made it clear that civil RICO cases need not be tied close-ly to criminal RICO prosecutions; and the vast majority of civil RICO cases involve "garden variety" fraud, which does not require sophisticated interpretation of any of the predicate offense statutes.

In *Sedima,* the Court held, *inter alia,* that a criminal RICO conviction is not prerequisite to a civil RICO action. 105 S.Ct. at 3281–84. In so holding, the Court reasoned that there is no need that the predicate acts of a RICO claim be established beyond a reasonable doubt. *Id.* at 3287. The Court also rejected the argument that, absent the prior convictions requirement, the civil RICO remedy would be used to circumvent the constitutional protections of the criminal law. *Id.* at 3283.

The above reasoning suggests that the civil provisions need not follow the criminal procedural provisions of the criminal predicate acts. In fact, most civil RICO cases involve little or no interpretation of the federal criminal statutes.

In finding that the federal exclusivity of the predicate acts does not rebut the presumption of concurrent jurisdiction, Judge Williams, of the Eastern District of Virginia, wrote as follows:

> First, in adjudicating a RICO case, state courts only need determine whether the alleged predicate acts did or did not occur. This type of factual finding is unlikely to involve any complex interpretation of the underlying federal statutes, which would require exclusive jurisdiction. Second, as a practical matter, state courts are unlikely to find themselves in the position of interpreting and applying the underlying federal statutes. The vast majority of RICO cases involve garden variety state law fraud, where the plaintiff has simply seized upon RICO to obtain federal jurisdiction, treble damages, and attorney fees. If anything, RICO involves federal courts in the adjudication of state law claims, rather than the other way around. *See Sedima,* 105 S.Ct. at 3287 n. 16.

*HMK Corporation v. Walsey,* 637 F.Supp. 710, 717 (E.D.Va.1986). The exclusivity factors "cannot support exclusive federal jurisdiction over claims whose governing

rules are borrowed from state law." *Gulf Offshore*, 453 U.S. at 484, 101 S.Ct. at 2878. Although not totally borrowed from state law, as with the tort claims involved in *Gulf Offshore*, the civil RICO claims often involve application of state common law fraud concepts, concepts with which the state courts have considerable experience.

The high number of civil RICO filings also supports concurrent jurisdiction. In recent years there has been a veritable explosion in the number of civil RICO claims filed. *See Sedima, S.P.R.L. Corp. v. Imrex Co.*, 741 F.2d 482, 487 (2d Cir. 1984), *rev'd*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985); *see also Sedima*, 105 S.Ct. at 3277 n. 1. This increased number of filings, combined with the garden variety fraud nature of most of the cases, further strengthens the presumption of concurrent jurisdiction. Additionally, many of these RICO cases include pendent pure state law claims, as does this very case.

In sum, the presumption of concurrent jurisdiction has not been rebutted by explicit statutory directive, by unmistakable implication from legislative history, or by a clear incompatibility between state court jurisdiction and federal interests. This Court holds that federal jurisdiction to hear civil RICO cases under 18 U.S.C. § 1964(c) is concurrent, not exclusive.

As an alternative approach, this Court also is convinced that exclusive jurisdiction over a federal claim will not bar abstention in all cases. The Fourth Circuit has ruled, with respect to *Colorado River* abstention, that " 'the presence of federal-law issues must always be a major consideration weighing against surrender,' and that such consideration is even more significant when federal jurisdiction is exclusive." *Kruse v. Snowshoe Co.*, 715 F.2d 120, 124 (4th Cir.1983), *cert. denied*, 465 U.S. 1065, 104 S.Ct. 1413, 79 L.Ed.2d 739 (1984), (quoting *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 26, 103 S.Ct. 927, 942, 74 L.Ed.2d 765 (1983)). If the Fourth Circuit had meant that exclusive federal jurisdiction is an absolute bar to abstention, it

would have so stated. Regardless, this Court is convinced that the state courts may exercise concurrent jurisdiction over civil RICO suits.

Because exercise of federal jurisdiction in this case would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern, *Burford* abstention is proper.

### B. *Colorado River Abstention*

This Court also believes that abstention is proper on the limited grounds established in *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 *reh. denied*, 426 U.S. 912, 96 S.Ct. 2239, 48 L.Ed.2d 839 (1976).

The Supreme Court has recognized that abstention may be proper, in very limited cases, where "[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation" so requires. *Id.* 424 U.S. at 817, 96 S.Ct. at 1246.

The *Colorado River* opinion discussed four factors to be considered when deciding whether or not to abstain: 1) which court, if any, has assumed jurisdiction over the property at issue; 2) inconvenience of the federal forum; 3) avoidance of piecemeal litigation; and 4) the order in which the courts obtained jurisdiction. *Id.* at 818, 96 S.Ct. at 1246.

*Moses H. Cone Hospital v. Mercury Construction Corporation*, 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), added two factors: 1) whether state or federal law provides the substantive rule to determine the merits; and 2) the adequacy of the state court proceedings to protect the federal right. *Kruse v. Snowshoe Co.*, 715 F.2d at 123.

The four original *Colorado River* factors weigh heavily in favor of abstention in this case. The existence of a federal law claim weighs somewhat against abstention, but is outweighed by the importance of preventing duplicative litigation, by the im-

portance of protecting the integrity of the state court proceedings, and by the similarity of the RICO claims to state fraud claims.

First, the state court has assumed jurisdiction over the property at issue. As discussed *ante*, MDIF has filed a similar action against the First Maryland directors in state court. Judge Kaplan has exercised jurisdiction over the suit, including, presumably, the property and assets of the defendants.

Second, the federal forum is inconvenient here, not because of distance, as in *Colorado River*, but because of the stage of development of the state actions. To repeat discovery in this case would be the exact waste of judicial effort sought to be avoided by the *Colorado River* doctrine.

Third, and most important in this case, as it was in *Colorado River* itself, is the prevention of piecemeal litigation. Judge Kaplan has issued several orders concerning the efficient disposition of assets to the depositors. Plaintiffs are attempting to attack those rulings, particularly the one regarding interest, by use of the federal civil RICO provisions. Proceeding with this case in this Court would not only undermine this particular decision of Judge Kaplan, but also would impose the spectre of collateral attack, *viz.* a RICO claim for relief in the federal courts, of any order of Judge Kaplan in any savings and loan case. Such adjudication is highly disfavored when contrasted with the efficient administration of the affairs by a single judge, who is an expert in the area.

Fourth, the order and degree of progression of these two cases support abstention. The state court's administration of First Maryland's affairs has been proceeding since June 19, 1986. As stated above, all the cases have been assigned to Judge Kaplan. Judge Kaplan has issued many orders in the cases. Thus, Judge Kaplan is in a much better position than this Court to adjudicate all claims and counterclaims arising from the savings and loan crisis.

Other savings and loan cases in this Court have been dismissed on *Colorado River* grounds. *American Casualty Company of Reading, Pa. v. Community Savings & Loan*, 635 F.Supp. 539 (D.Md. 1986); *Northern Virginia Law School, Inc. v. Harry Hughes*, No. B–85–3200 (D.Md. Nov. 22, 1985) *quoted substantially in American Casualty*, 635 F.Supp. at 542–43. For abstention purposes, the only distinction between this case and those cases is that this case involves a federal question claim.[4] The presence of a federal claim is a major consideration weighing against abstention, especially if federal jurisdiction is exclusive. *Kruse v. Snowshoe Company*, 715 F.2d at 124 (citing *Cone*, 460 U.S. at 25–26, 103 S.Ct. at 941–942). As stated *ante*, the federal courts do not have exclusive jurisdiction over RICO claims. It is the view of this Court that the nature of these particular RICO claims is such that the state court is more than capable of adjudicating them. These are classic fraud cases. Consequently this Court also does not believe that this is a situation where the plaintiffs' federal rights will not be protected adequately in state court.

In sum, this Court does not believe that the pendency of a RICO claim outweighs the considerations noted by Judge Black and Judge Ramsey, respectively, in *Northern Virginia Law School* and *American Casualty Co.* Abstention, therefore, is proper under *Colorado River*, as well as under *Burford*. Where abstention is proper under either or both of these doctrines, the proper relief is dismissal of the action. *See American Casualty Co.*, 635 F.Supp. at 543.

A separate Order will be entered dismissing this case as against the MSSIC defendants for failure to state a claim upon which relief can be granted, and dismissing this

---

**4.** None of those cases involved the exact situation of investors suing the directors of a savings and loan in receivership. However, as discussed *ante* at pp. 722–724, this suit clearly falls within the remedial scheme set up in response to the savings and loan crisis.

case as against the First Maryland defendants on grounds of abstention.

*APPENDIX*

Comparison of Allegations Against the First Maryland Directors

Made in

Amended Complaint in This Action

With

*MDIF v. Seidel,* No. 13408,

In The Circuit Court for Montgomery County, Maryland

The following paragraphs of the amended complaint in this action make the same or similar allegations against the First Maryland directors as the noted paragraphs of the original complaint in *MDIF v. Seidel.*

| Amended Complaint (Paper No. 21.5) | MDIF v. Seidel (Paper No. 36, Exh. 1) |
|---|---|
| ¶ 52(a) | ¶¶ 35, 49, 50 |
| ¶ 52(b) | ¶ 41 |
| ¶ 52(c) | ¶ 47 |
| ¶ 52(d) | ¶ 48 |
| ¶ 52(e) | ¶¶ 51, 67 |
| ¶ 52(f) | ¶ 23 |
| ¶ 53(a) | ¶¶ 35, 40 |
| ¶ 53(b) | ¶ 35 |
| ¶ 53(c) | ¶¶ 35, 40 |
| ¶ 53(d) | ¶ 35 |
| ¶ 53(c) | ¶ 29 |
| ¶ 53(h) | ¶¶ 45, 49 |
| ¶ 53(i) | ¶¶ 45, 46 |
| ¶ 53(j) | ¶¶ 52–58 |
| ¶ 53(k) | ¶ 35 |
| ¶ 53(*l*) | ¶ 35 |
| ¶ 53(m) | ¶ 44 |
| ¶ 53(n) | ¶¶ 41, 42 |
| ¶ 53(o) | ¶ 35 |
| ¶ 53(p) | ¶ 35 |
| ¶ 53(q) | ¶ 35 |
| ¶ 54(a) | ¶ 59 |
| ¶ 54(b) | ¶ 59 |
| ¶ 54(d) | ¶ 59 |
| ¶ 54(i) | ¶¶ 52–58 |
| ¶ 55 | ¶¶ 25, 28, 30 |
| ¶ 56 | ¶¶ 26, 27, 29 |