859 F.2d 1179
 57 USLW 2251, RICO Bus.Disp.Guide 7046
 John P. BRANDENBURG; John P. Huffman, as custodian for
Robert F. Coon, a minor; Baikunth K. Singh; Mridulah
Singh, custodian for Anup Singh, a minor, and Alka Singh, a
minor; Frank J. Talbot, Plaintiffs-Appellants,
v.
Julian SEIDEL; Frank J. Calcara; David P. Cole; Robert
Corletta; Edward A. Dacy; Michael Finci; Ronald
Freudenheim; Alan S. Kerxton; Benjamin Maisel; Gloria
Meyers; James Porter; Anne Sherman; Charles C. Hogg, II;
Frances F. Anderson; Leonard Bass; Dennis B. Berlin;
Michael J. Dietz; Jerome F. Dolivka; John C. Donohue, Sr.;
Henry R. Elsnic; John D. Faulkner, Jr.; James D.
Laudeman; Terry L. Neifeld; George W.H. Pierson;
Baltimore County Savings and Loan Association, Inc.; Chevy
Chase Savings and Loan Association, Inc.; Cowenton Savings
and Loan Association; Fairmount Savings and Loan
Association; Madison and Bradford Savings and Loan
Association; Parkville Savings and Loan Association; Paul
B. Trice, Jr., Defendants-Appellees,
v.
MARYLAND SAVINGS & LOAN DEPOSITORS COMMITTEE; First
Maryland Depositors Association, Amici Curiae.
 No. 87-1116
 United States Court of Appeals,
Fourth Circuit.
 Argued May 3, 1988.
Decided Oct. 11, 1988.
 
 Arthur M. Kaplan (Edward B. Rock, Fine, Kaplan and Black, Philadelphia, Pa. Andrew P. Goldstein, Washington, D.C., Kieron F. Quinn, Robert B. Kershaw, Thomas Minton, Quinn, Ward and Kershaw, P.A., Baltimore, Md., on brief), for plaintiffs-appellants.
 Lawrence Greenwald (William D. Gruhn, Gordon, Feinblatt, Rothman, Hoffberger & Hollander, Baltimore, Md., on brief), Andrew H. Marks (David B. Siegel, Luther Zeigler, Sara C. Jones, Crowell & Moring, Washington, D.C., Thomas Bodie, Power & Mosner, Towson, Md., Francis S. Brocato, Harold H. Burns, Jr., Baltimore, Md., David J. Cynamon, Thomas M. Brownell, Shaw, Pittman, Potts & Trowbridge, Washington, D.C., Jerold Oshinsky, New York City, Nancy A. Markowitz, Anderson, Baker, Kill & Olick, Howard B. Possick, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C., Michael J. Travieso, Gallagher, Evelius & Jones, Alva P. Weaver, III, Baltimore, Md., Stephen C. Winter, Ridgely, Hanley & Winter, John H. Zink, III, Cook, Howard, Downes & Tracy, Towson, Md., on brief), for defendants-appellees.
 H. Robert Erwin, Jr. (Pretl & Erwin, P.A., Baltimore, Md., on brief), for amici curiae.
 Before PHILLIPS and ERVIN, Circuit Judges, and RAMSEY, United States District Judge for the District of Maryland, sitting by designation.
 PHILLIPS, Circuit Judge:
 
 
 1
 Plaintiffs, depositors in the insolvent First Maryland Savings and Loan Association (First Maryland), appeal the dismissal of their action against certain former officers, directors, and senior management personnel of First Maryland (the First Maryland defendants), as well as certain former officers and directors of the Maryland Savings-Share Insurance Corporation (MSSIC) and the individual savings and loan institutions with which those individuals were affiliated during their tenure at MSSIC (the MSSIC defendants). Their amended complaint contained two counts based on the civil provisions of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. Secs. 1961-1968, as well as several pendent state law claims. The district court dismissed the action prior to trial. The court dismissed the civil RICO count against the MSSIC defendants for failure to state a claim and declined to exercise its discretionary jurisdiction over the pendent state claims against those defendants. It then dismissed the claims--both federal and state--against the First Maryland defendants on abstention grounds, in deference to the ongoing state receivership proceedings. We affirm, though on somewhat different grounds as to the MSSIC defendants.
 
 
 2
 * The Maryland Savings-Share Insurance Corporation (MSSIC) was a quasi-public non-profit corporation established by the Maryland legislature in 1962 to insure accounts in state-chartered savings and loan associations. MSSIC was given substantial regulatory control over its member institutions, which by 1985 numbered approximately 100.[1] In May 1985, rumors of financial instability at two savings and loans insured by MSSIC--Old Court and Merritt--triggered a general run on MSSIC-insured thrifts. The resulting panic threw MSSIC itself into financial peril and threatened to lead to the collapse of the state's savings and loan industry. In response, the Governor of Maryland declared a state of public crisis, issued an Executive Order limiting withdrawals from all MSSIC-insured institutions to a maximum of $1,000 per account per month, and called the Maryland General Assembly into emergency session. In special sessions held in May and October-November of 1985, the General Assembly passed a package of legislation designed to deal comprehensively with the crisis in the state's savings and loan industry. See 1985 Md.Laws, 1st Sp.Sess., ch. 1-11; 1985 Md.Laws, 2d Sp.Sess., ch. 3-6. Further refinements were added in the legislature's regular session in 1986. See 1986 Md.Laws, ch. 11-12.
 
 
 3
 This legislative effort had two principal components. First was the creation of a state-operated deposit insurance fund, the Maryland Deposit Insurance Fund (MDIF), to replace the ruined MSSIC. MDIF was given all of MSSIC's powers, duties, and responsibilities and assumed all of its assets and liabilities, including its insurance obligations to depositors at member institutions. See generally Md.Fin.Inst.Code Ann. Secs. 10-101 to 10-121 (establishing and defining structure and powers of MDIF). Second, and of particular importance here, was the establishment of a comprehensive framework for the administration of conservatorship and receivership proceedings for insolvent savings and loan associations. See Md.Fin.Inst.Code Ann. Secs. 9-701 to 9-712. Section 9-709 gave MDIF the right to be appointed conservator or receiver of any savings and loan association insured by it. Section 9-710 gave the state court administering the conservatorship or receivership of such an institution "exclusive and plenary jurisdiction over all claims, actions, and proceedings that are brought by any person and that are related to the assets, property, powers, rights, privileges, duties and liabilities" of that institution or of MDIF in its capacity as conservator or receiver.[2] To implement this comprehensive scheme, the Maryland Court of Appeals appointed a single judge, Judge Joseph Kaplan of the Circuit Court for the City of Baltimore, to adjudicate all claims arising out of the conservatorship/receivership proceedings for the failed savings and loan associations.
 
 
 4
 First Maryland was a state-chartered savings and loan association formerly insured by MSSIC. In November 1985, Judge Kaplan found First Maryland to be in an impaired condition and appointed MDIF as its conservator. The conservatorship order froze the interest rates on most First Maryland accounts at 5 1/2% per annum. But First Maryland's financial problems proved insurmountable, and on June 19, 1986, Judge Kaplan formally placed First Maryland in receivership, appointing MDIF receiver and giving it total control over First Maryland's assets. The receivership order terminated the continuing accrual of interest of all First Maryland accounts as of that date. No appeal was taken from that order.
 
 
 5
 In carrying out its statutory duty as receiver to consolidate First Maryland's assets for distribution to its depositors and other creditors, MDIF has filed actions in state court against various parties believed to have participated in the misappropriation of the institution's assets. Chief among these is an action against First Maryland's former officers and directors seeking $45 million in compensatory and punitive damages for their wrongful depletion of the thrift's assets, based on theories of fraud, breach of fiduciary duty, conspiracy, negligence, gross negligence, waste, and conversion. MDIF v. Seidel, No. 13408 (Cir.Ct. of Mont.Co). MDIF has also instituted a state court action against certain former directors of MSSIC, seeking damages for their alleged complicity in the fraud perpetrated by the former directors of First Maryland and other insolvent thrifts. MDIF v. Hogg, No. 113102 (Cir.Ct. Anne Arundel Co.).
 
 
 6
 To date, MDIF has distributed over $110 million in First Maryland assets to the institution's depositors. In July 1986, MDIF returned up to $5,000 of principal to each depositor, depending on the amount in his or her account. In December 1986, MDIF distributed another $41 million generated through the sale of First Maryland's assets to its depositors. As additional assets are collected and liquidated, MDIF will distribute the proceeds to the depositors. MDIF estimates, however, that the depositors may not be repaid the entire principal of their accounts until 1990 or thereafter, and that they may never be compensated for the interest lost on their accounts during First Maryland's insolvency.
 
 
 7
 Not satisfied with MDIF's efforts, the plaintiffs filed this action in federal court on behalf of themselves and a class consisting of all persons who had money deposited in First Maryland as of August 23, 1985.[3] Named as defendants are First Maryland and a number of its former officers, directors, and senior management personnel (the First Maryland defendants), as well as 12 former officers and directors of MSSIC and the various savings and loan associations with which those individuals were affiliated during their tenure at MSSIC (collectively, the MSSIC defendants). In this action, the plaintiffs seek damages to compensate them for being deprived of the use of their savings--and of the interest thereon--during the period in which First Maryland has been in conservatorship or receivership.
 
 
 8
 The amended federal complaint, which is the subject of this appeal, contains seven counts. Count I asserts a civil RICO claim against both the First Maryland defendants and the MSSIC defendants, based on allegations that they used the mails and interstate wires to make a series of fraudulent misrepresentations about the security of deposits at First Maryland and other MSSIC-insured savings and loans, in order to induce the public to deposit money in those institutions. Count II asserts a civil RICO claim against the First Maryland defendants only, based on allegations that they misappropriated the thrift's assets through numerous acts of self-dealing extending over a number of years. The remaining counts assert a number of pendent state claims. Counts III and IV assert claims against the MSSIC defendants for fraud, deceit, negligent and intentional misrepresentation, and civil conspiracy, based on their dissemination of allegedly false information about the security of accounts at First Maryland and other MSSIC-insured institutions. Count V asserts claims against First Maryland for conversion and breach of contract arising out of its failure "through its conservator MDIF," to release or pay interest on the plaintiffs' accounts.[4] Counts VI and VII assert claims against the MSSIC defendants for negligence, gross negligence, and breach of fiduciary duty, based on their alleged failure to exercise adequate regulatory control over financial practices at First Maryland and other MSSIC-insured institutions.
 
 
 9
 The district court dismissed the plaintiffs' claims against all defendants prior to trial. The court held first that the civil RICO count against the MSSIC defendants should be dismissed under Fed.R.Civ.P. 12(b)(6) for failure to allege a legally sufficient pattern of racketeering activity and that the pendent state claims against those defendants should be dismissed under United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The court then concluded that the claims against the First Maryland defendants--under both civil RICO and state law--should be dismissed on abstention grounds, in deference to the ongoing state receivership proceedings.
 
 
 10
 This appeal followed.
 
 II
 
 11
 We consider first the dismissal of the counts against the MSSIC defendants. We agree with the district court that the civil RICO count against those defendants fails to state a claim, but we reach that conclusion by a somewhat different route.
 
 
 12
 The district court dismissed on the basis that the complaint failed adequately to allege a RICO "pattern." It did not address an alternative basis urged by defendants: that even were a pattern sufficiently alleged, an adequate causal connection between pattern and cognizable injury to plaintiffs was not.
 
 
 13
 Because we have serious reservations about the district court's "no-pattern" conclusion, we rest affirmance on the alternative "no-causal connection" ground, a theory advanced by defendants both in the district court and here. See Stern v. Merrill Lynch, Pierce, Fenner and Smith, Inc., 603 F.2d 1073, 1093 (4th Cir.1979) (proper to affirm on alternative ground advanced but not considered in trial court).
 
 
 14
 Though in the end we rest affirmance on the alternative ground, we believe it nevertheless prudent first to discuss in some detail the "no-pattern" basis relied upon by the district court in order to indicate why we decline to affirm on that basis. We do so out of considerations of fairness to the litigants, concern for the doctrinal integrity of our ongoing applications of the difficult "pattern" concept, and, most importantly, because of the special need in this case to emphasize the conceptual independence, despite their close relationship, of the pattern and causation elements of the civil RICO claim.
 
 
 15
 * To discuss the "pattern" issue, we begin at the beginning. 18 U.S.C. Sec. 1964(c) provides a private action for treble damages and attorneys' fees to "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." The civil RICO claim at issue here is based on alleged violations of Secs. 1962(a), (c), and (d). All of these subsections require a showing that the defendants engaged in a "pattern of racketeering activity."[5] The RICO statute defines "racketeering activity" to include, inter alia, any act indictable under certain provisions of the federal criminal code, including 18 U.S.C. Sec. 1341 (mail fraud), 18 U.S.C. Sec. 1343 (wire fraud), and 18 U.S.C. Sec. 2314 (interstate transportation of fraudulently obtained funds). See 18 U.S.C. Sec. 1961(1). A "pattern of racketeering activity" is in turn defined as at least two acts of racketeering activity within ten years of each other. See 18 U.S.C. Sec. 1961(5). In Sedima, SPRL v. Imrex Co., 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), the Supreme Court noted that while two such acts are necessary to make out a RICO pattern, they may not be sufficient. Id. at 496 n. 14, 105 S.Ct. at 3285 n. 14. To constitute a pattern, the Court indicated, predicate acts of racketeering activity must reflect both "continuity" and "relationship." Id.
 
 
 16
 Since Sedima, this court has wrestled with the concept of a RICO pattern on a number of occasions, see, e.g., Walk v. Baltimore & Ohio RR, 847 F.2d 1100 (4th Cir.1988); Eastern Publishing & Advertising, Inc. v. Chesapeake Publishing & Advertising, Inc., 831 F.2d 488 (4th Cir.1987); HMK Corp. v. Walsey, 828 F.2d 1071 (4th Cir.1987); International Data Bank v. Zepkin, 812 F.2d 149 (4th Cir.1987). In these cases, we have deliberately declined to adopt any mechanical rules to determine the existence of a RICO pattern, holding instead that the issue is a "matter of criminal dimension and degree" to be decided on a case-by-case basis. See Zepkin, 812 F.2d at 155. Factors relevant to this inquiry include the number and variety of predicate acts and the length of time over which they were committed, the number of putative victims, the presence of separate schemes, and the potential for multiple distinct injuries. See Morgan v. Bank of Waukegan, 804 F.2d 970, 975 (7th Cir.1986). These factors are not exclusive, and no one of them is necessarily determinative; instead, a carefully considered judgment taking into account all the facts and circumstances of the particular case--with special attention to the context in which the predicate acts occur--is required. See Walk, 847 F.2d at 1103-04; HMK, 828 F.2d at 1074. The mere fact that the predicate acts alleged can be characterized as part of the same overall scheme does not automatically prevent their constituting a RICO pattern. See Walk, 847 F.2d at 1106; Zepkin, 812 F.2d at 155. Similarly, the fact that a scheme to defraud requires several acts of mail or wire fraud in order to accomplish its objective does not automatically make it a RICO pattern. See Walk, 847 F.2d at 1104; Zepkin, 812 F.2d at 154-55. With us, the pattern inquiry remains a flexible one whose ultimate focus must always be on whether the related predicate acts indicate "ongoing criminal activity of sufficient scope and persistence to pose a special threat to social well-being." Walk, 847 F.2d at 1106; See Zepkin, 812 F.2d at 155.
 
 
 17
 In this case, the civil RICO count against the MSSIC defendants is based on allegations that they made a series of misleading statements in order to induce the public to deposit money in First Maryland and other MSSIC-insured institutions, including:
 
 
 18
 (1) running print and broadcast advertisements designed to create the misimpression that MSSIC was an agency of the state of Maryland;
 
 
 19
 (2) distributing various documents--including a brochure entitled "We Have the Answers" and a letter entitled "An Open Letter to a Potential MSSIC Saver"--designed to create the misimpression that MSSIC was an agency of the state of Maryland and that it effectively regulated its member institutions to insure the safety of deposits therein;
 
 
 20
 (3) giving false assurances of security, both in writing and over the telephone, to depositor inquiries about the safety of accounts in MSSIC-insured institutions;
 
 
 21
 (4) encouraging member institutions to use the MSSIC seal, which is similar to the State of Maryland's seal, in print and broadcast ads, in order to create the misimpression that their accounts were insured by the state of Maryland;
 
 
 22
 (5) deliberately concealing adverse information about member institutions from the press; and
 
 
 23
 (6) distributing documents and running print and broadcast advertisements misrepresenting the nature and value of the insurance offered by MSSIC.
 
 
 24
 See Amended Complaint paragraphs 81-84. The plaintiffs allege that the MSSIC defendants thereby committed multiple acts of mail and wire fraud, as well as interstate transportation of fraudulently obtained funds, all of which are proper predicate offenses under the RICO statute.
 
 
 25
 The district court found these allegations insufficient to set forth a RICO pattern. The court reasoned that while the predicate acts alleged were sufficient in number, adequately related, and spread out over time, they lacked the requisite "continuity" to make out a RICO pattern. See Brandenburg v. First Maryland Sav. & Loan, 660 F.Supp. 717, 727 (D.Md.1987). This was so, said the district court, because they were all in furtherance of a single "limited" scheme to encourage the public to deposit money in First Maryland and other MSSIC-insured savings and loans by representing deposits in those institutions to be more secure than they actually were. See id. at 727-28. In the district court's view, this scheme--which it characterized as a "one-time plan to accomplish a single goal"--did not "set forth the type of continuous criminal endeavor that will establish a pattern of racketeering as defined in Sedima and [Zepkin ]." Id. at 727.
 
 
 26
 Though the issue is a close one and the district court's analysis arguably faithful to our precedents, we are sufficiently concerned with its accuracy that we choose not to rest affirmance upon it. The predicate acts alleged here spanned a period of more than three years and were directed at more than 22,000 putative victims. Though they can be characterized as part of a single scheme, it was not a scheme that is easily treated as one limited in scope to the accomplishment of a single discrete objective. This is not a case, for example, like Zepkin, where the predicate acts alleged were all designed to defraud a small group of victims in connection with a single transaction. Instead, the predicate acts of fraud, as alleged here, were directed at an enormous group of persons--the investing public--in connection with a virtually limitless number of deposit transactions. Nor is this case easily likened to Walk, where the predicate acts alleged, though occurring in connection with several related transactions spread out over a number of years, were all steps in the path to the accomplishment of a single limited goal--squeezing out the minority in a particular corporate structure. Unlike the scheme in Walk, the scheme as alleged here did not involve the commission of multiple preparatory acts aimed at the infliction of a single basic injury, but the commission of a series of independent acts that were distinct criminal ends in themselves.[6] In contrast to the scheme in Walk, this scheme as alleged had no limiting goal whose accomplishment would bring the criminal activity it spawned to an end. Indeed, the criminal activity as pleaded here threatened to continue unabated, driven by the possibility of repeated economic gain, until the defendants were caught. Such a scheme--though "single"--is arguably of the type whose very scope and persistence poses a special threat to social well-being, a possibility we have recognized. See Zepkin, 812 F.2d at 155; see also Liquid Air Corp. v. Rogers, 834 F.2d 1297, 1304-05 (7th Cir.1987) (allegations that defendants mailed 19 separate false shipping invoices over a period of seven months were sufficient to state a pattern, because each false invoice threatened an independent economic injury); Illinois Dept. of Revenue v. Phillips, 771 F.2d 312, 313 (7th Cir.1985) (allegations that defendant mailed nine separate fraudulent sales tax returns to the state were sufficient to state a pattern, because each false return threatened an independent economic injury).
 
 
 27
 As this analysis indicates, the district court's conclusion that a RICO pattern had not been sufficiently alleged is open at least to serious question under our precedents. Because the issue therefore is close, the pattern concept a difficult one whose outer bounds are yet unclear, and the question as presented here one of the sufficiency of bare-bones pleading allegations, we decline to pass upon it. We may do so because of our conclusion that affirmance is compelled on the much firmer, alternative causation ground.
 
 
 28
 Accordingly, we assume, without deciding, that a RICO pattern was sufficiently alleged and turn, as this assumption requires, to the causation question. Before doing so, we emphasize that to find, or assume, that a RICO pattern of racketeering activity consisting of acts of mail and wire fraud has been shown does not also establish that its intended victims were injured, nor beyond that, that any injury suffered by them was sufficiently caused by the acts to create RICO liability. This follows because indictable acts of mail or wire fraud may be proven without any proof of detrimental reliance by, hence of injury to, the intended victims. See Armco Indus. Credit Corp. v. SLT Warehouse Co., 782 F.2d 475, 481-82 (5th Cir.1986).
 
 B.
 
 29
 To make out a civil action for damages under the RICO statute a private plaintiff must demonstrate not only that the defendants have violated Sec. 1962, but also that he has been "injured in his business or property by reason of [the alleged] violation of section 1962." 18 U.S.C. Sec. 1964(c).[7] The quoted language requires the plaintiff to make two closely related showings: (1) that he has suffered injury to his business or property; and (2) that this injury was caused by the predicate acts of racketeering activity that make up the violation of Sec. 1962. See Nodine v. Textron, Inc., 819 F.2d 347, 348 (1st Cir.1987).[8] As the Seventh Circuit has said, "[a] defendant who violates section 1962 is not liable for treble damages to everyone he might have injured by other conduct, nor is [he] liable to those who have not been injured." See Haroco, Inc. v. American Nat'l Bank & Trust Co., 747 F.2d 384, 398 (7th Cir.1984), aff'd, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). The Supreme Court has explained these injury and causation requirements as aspects of standing, rather than elements of the civil RICO plaintiff's prima facie case. See Sedima, 473 U.S. at 496-97, 105 S.Ct. at 3285 (Under Sec. 1962(c), a "plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation."). In any event, it is clear that a civil RICO complaint is vulnerable to a motion to dismiss if it fails to allege either an adequate injury to business or property, see, e.g., Drake v. BF Goodrich Co., 782 F.2d 638, 644 (6th Cir.1986), or an adequate causal nexus between that injury and the predicate acts of racketeering activity alleged, see, e.g., Pujol v. Shearson/American Express, Inc., 829 F.2d 1201, 1204-06 (1st Cir.1987); Nodine, 819 F.2d at 348-49; Morast v. Lance, 807 F.2d 926, 932-33 (11th Cir.1987); In re Gas Reclamation, Inc. Securities Litigation, 663 F.Supp. 1123, 1124-26 (S.D.N.Y.1987).
 
 
 30
 The civil RICO count at issue here contains an adequate allegation of injury to the plaintiffs' business or property: the loss of interest income on their First Maryland savings accounts and certificates of deposit during the period in which First Maryland has been in conservatorship and receivership. See Amended Complaint paragraphs 102-107. But the MSSIC defendants argue that the plaintiffs have failed adequately to plead the requisite causal connection between this injury and the predicate acts of racketeering activity that they are alleged to have committed. We agree.
 
 
 31
 The only predicate acts of racketeering activity of which the MSSIC defendants stand accused are acts of mail and wire fraud and interstate transportation of fraudulently obtained funds committed in connection with their dissemination of certain allegedly misleading information about the security of deposits in MSSIC-insured thrifts. See Amended Complaint paragraphs 93-97.[9] The causal connection between these acts and the plaintiffs' loss of interest is not at all clear from the pleadings themselves. The Amended Complaint alleges simply that:
 
 
 32
 As a result of defendants' violations of law, a run did take place on MSSIC institutions, including First Maryland, and First Maryland was unable to meet and did not meet its obligations to First Maryland depositors, and MSSIC was unable to meet and did not meet its insurance obligations to First Maryland depositors, including the plaintiffs and class members herein.
 
 
 33
 See id. paragraph 102. There is no explanation of how the MSSIC defendants' misrepresentations caused the run--nor could there be, for the cause of the run was obviously the public's discovery that certain MSSIC-insured institutions were teetering on the brink of insolvency because of self-dealing by their officers and directors. While the MSSIC defendants' negligent failure to prevent unsound financial practices at MSSIC's member institutions may have contributed to the run, and thus to the plaintiffs' injury, acts of negligence are not predicate acts under the RICO statute, and Sec. 1964(c) provides no cause of action to individuals injured by conduct other than predicate acts of racketeering activity. See Nodine, 819 F.2d at 349.
 
 
 34
 The plaintiffs argue that the Amended Complaint alleged two causal nexus between the MSSIC defendants' misrepresentations and their loss of interest, either of which is sufficient to satisfy Sec. 1964(c). First, they claim to have alleged that the misrepresentations caused a huge influx of deposits into MSSIC's member institutions, stretching MSSIC's insurance commitments far beyond their limits and resulting in MSSIC's inability to meet its insurance obligations to the plaintiffs when the run occurred. See Reply Brief for Appellants at 21-22, citing Amended Complaint, paragraphs 102-106. But while MSSIC's overextension may well have contributed to the plaintiffs' loss--in the sense that it removed the safety net of insurance that should have protected them upon First Maryland's insolvency--that overextension was not caused by the MSSIC defendants' misrepresentations but by their negligent failure to maintain adequate reserves.
 
 
 35
 The plaintiffs also claim to have alleged that the MSSIC defendants' misrepresentations induced them to deposit their money in First Maryland. See Brief for Appellants at 22, citing Amended Complaint, paragraphs 3-7. But the Amended Complaint contains no specific allegation that the named or class plaintiffs acted in reliance on any misrepresentations directly made by the MSSIC defendants when they decided to deposit their money in First Maryland.[10] Instead, the plaintiffs allege that they deposited their money in First Maryland in reliance on deceptive newspaper ads placed by First Maryland itself. See Amended Complaint paragraphs 3-7. The only connection between these ads and the MSSIC defendants is the fact that they contained the MSSIC seal, which the plaintiffs contend created the misimpression that MSSIC was an agency of the state of Maryland and thus, by implication, that deposits in its member institutions were insured by the state. Even assuming that use of the seal by First Maryland can be considered a representation by the MSSIC defendants, we do not think that representation was sufficiently misleading to serve as the basis for a predicate act of fraud. Though not a state agency, MSSIC was created by the Maryland legislature as part of a regulatory response to the state's first savings and loan crisis. See Letter of Stephen Sachs, Attorney General of the State of Maryland, to Wilbur D. Preston, Jr., Special Counsel, JA 122-23. The MSSIC seal has been in continuous use for over 23 years, with the knowledge and blessing of both the legislative and executive branches of the state government. Id. Under these circumstances, we do not think any representations of state involvement conveyed by the seal can serve as the basis for predicate acts of mail and wire fraud. Accordingly, any injury caused the plaintiffs by the ads containing the seal was not caused by any predicate acts of racketeering activity.
 
 
 36
 In sum, we conclude that the plaintiffs have alleged at most a cause-in-fact connection between any fraudulent misrepresentations made by the MSSIC defendants and plaintiffs' later loss of interest income on their First Maryland deposits. It is obvious that, as a factual matter, plaintiffs would not have lost any interest on their deposits but for having made them in the first place. Further, it may be inferred in this context, though it is not so obvious, that their particular losses would have been avoided in the end by insurance coverage but for the fact that too many others had also made deposits. To the extent therefore that any misrepresentations by defendants may have caused these particular plaintiffs to deposit in the first place and other depositors then to have increased overall deposits past the point of insurance coverage, the plaintiffs have surely alleged a degree of causal connection between defendants' conduct and their injury. But, as indicated, it is no more than a bare cause-in-fact connection, and a most attenuated one at that.
 
 
 37
 Such a cause-in-fact connection, standing alone, does not suffice to establish liability. Civil RICO is of course a statutory tort remedy--simply one with particularly drastic remedies. Causation principles generally applicable to tort liability must be considered applicable. These require not only cause-in-fact, but "legal" or "proximate" cause as well, the latter involving a policy rather than a purely factual determination: "whether the conduct has been so significant and important a cause that the defendant should be held responsible." Prosser and Keeton Torts, Sec. 42 p. 272 (general principle) (5th ed. 1984); see also id., Sec. 110 p. 767 (applicable in fraud cases); Restatement (Second) of Torts, Sec. 548A (legal cause required in fraud cases). As such, the legal cause determination is properly one of law for the court, taking into consideration such factors as the foreseeability of the particular injury, the intervention of other independent causes, and the factual directness of the causal connection. See generally Restatement (Second) of Torts Sec. 548A comments a, b.[11]
 
 
 38
 Here we conclude as a matter of law that on the facts as alleged the misrepresentations charged to defendants were not so significant and important a cause of the plaintiffs' loss of income on their deposits and accounts that these defendants should be held responsible for them. In more specific terms of the statutory causation requirement, we conclude that plaintiffs have not been "injured in [their] business or property by reason of [the defendants' alleged] violation of Sec. 1962." 18 U.S.C. Sec. 1964(c).
 
 
 39
 As we have pointed out, the causal connection was in factual terms an extremely attenuated one. It rests on an assumption of actual reliance by the named plaintiffs (and the entire class) upon the defendants' advertising, through the medium of their seal's use, of their insured institutions' financial stability as the effective cause of plaintiffs' independent decisions to deposit their money in those institutions rather than do something else with it. That connection is certainly alleged, albeit in conclusory terms in the complaint, but this does not mean we may not take into account the slim thread of causal connection upon which it rests. More important is the consideration of all that had to transpire thereafter in order to bring upon plaintiffs the RICO injury they specifically alleged. Obviously the two most immediate causes were the alleged depredations of the insured institution's management, and the MSSIC defendants' negligent or reckless failure to prevent those depredations. That of course is what directly caused the run and ruin that followed, and neither of these of course constitute RICO predicate acts chargeable to these defendants. That these are in practical terms the intervening direct causes of the tragic losses sustained is of course reflected in the fact that they provide the basis for these plaintiffs' related pendent state claims in this action. We therefore hold that on the facts alleged, defendants' alleged misrepresentations may not properly be held the legal cause of the RICO injuries alleged by these plaintiffs.[12]
 
 
 40
 Since there are no other federal claims against the MSSIC defendants, we conclude that the district court did not abuse its discretion in dismissing the pendent state claims against those defendants as well. United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).
 
 III
 
 41
 We consider next the propriety of the district court's decision to abstain from deciding the claims against the First Maryland defendants.[13] Of the several abstention doctrines recognized by the Supreme Court, only two are arguably relevant here--the so-called Burford, see Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), and Colorado River, see Colorado River Water Conservation District v. United States, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), types.
 
 
 42
 Since Colorado River abstention applies, if at all, only in cases where the more traditional forms of abstention do not, see Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 14-15, 103 S.Ct. 927, 936-937, 74 L.Ed.2d 765 (1983), we begin our analysis with the Burford doctrine.
 
 
 43
 * In Burford, the Court held that it was proper for a federal court to abstain from deciding a challenge to an oil field proration order issued by a Texas state regulatory commission. The Court reasoned that the proper allocation of oil resources was a matter of substantial state concern, for which the state had set up a comprehensive regulatory scheme; that there was a significant need for uniform decision-making in the area, which the state had attempted to provide by consolidating review of all claims involving oil allocation in specialized state courts; that the intervention of the lower federal courts would create precisely the sort of disuniformity that the state system was designed to avoid; and that the federal rights at issue could adequately be vindicated in the state courts. 319 U.S. at 327-34, 63 S.Ct. at 1104-08.[14] Under such circumstances, the Court held, fundamental principles of comity required the federal court to stay its hand. Id.
 
 
 44
 We think this case presents a classic situation for Burford abstention. Maryland's legislature has set up a comprehensive scheme for the rehabilitation and liquidation of insolvent state-chartered savings and loan associations. The expeditious rehabilitation of the state's savings and loan industry is obviously a matter of substantial state concern. The liquidation process in particular is one which would be greatly impeded by the involvement of more than one decision-making authority. As the Eighth Circuit has noted:
 
 
 45
 Experience has demonstrated that in order to secure an economical, efficient, and orderly ... distribution of the assets of an insolvent corporation for the benefit of all creditors and stockholders, it is essential that the title, custody, and control of the assets be intrusted to a single management under the supervision of one court.
 
 
 46
 Motlow v. Southern Holding & Sec. Corp., 95 F.2d 721, 725-26 (8th Cir.1938); see Levy v. Lewis, 635 F.2d 960, 963-64 (2d Cir.1980). Maryland's legislature has therefore required all claims related to the assets of an insolvent savings and loan to be brought in the court supervising the conservatorship or receivership proceedings. See Md.Fin.Inst.Code Ann. Sec. 9-710. To ensure even greater uniformity of decision-making in the area, the Maryland courts have centralized all savings and loan conservatorship and receivership proceedings in a single state court.
 
 
 47
 Continuation of the federal action here would disrupt the state's efforts to provide a unified method for the liquidation of First Maryland in two ways. First, it would interfere with the efforts of First Maryland's state-appointed receiver, MDIF, to marshal the institution's assets for distribution to its depositors and other creditors according to the statutory priority scheme. The plaintiffs here seek damages from First Maryland's former officers and directors to compensate them for the losses they have suffered as depositors because of the defendant's mismanagement and misappropriation of First Maryland's assets--specifically, the interest they would have been paid on their First Maryland accounts had the defendants' misconduct not driven the institution into bankruptcy. But any action against First Maryland's officers and directors for misfeasance of their official duties properly belongs to MDIF as the thrift's receiver--and the representative of all its creditors--rather than to the depositors themselves, and the damages recoverable in such an action are assets of the institution itself, to be equitably distributed among all its creditors, not just its depositors. See Pritchard v. Myers, 174 Md. 66, 197 A. 620 (1938) (claim against directors of insolvent bank for "damages" caused by their mismanagement of the bank's assets belonged to the bank itself, rather than to the individual depositors, and could only be brought by the bank's receiver).[15] In its capacity as receiver, MDIF has already filed an action against First Maryland's former officers and directors, seeking compensation for losses First Maryland has suffered as a result of their wrongful diversion of its assets. Any recovery MDIF obtains in that action will go into the general pool of First Maryland assets for distribution to the thrift's creditors according to the rules of priority set forth in the state statute. See Md.Fin.Inst.Code Ann. Sec. 9-712. Allowing the plaintiffs to proceed with this action would permit them to circumvent that statutory distribution scheme by reaching assets of First Maryland in the hands of third parties, before the receiver can recover them for the institution's estate.
 
 
 48
 Second, permitting this action to go forward would directly undermine the integrity of several orders issued by the state receivership court. The damages claimed by the depositors here consist of interest which the receivership court has relieved First Maryland itself of the obligation to repay. The action is thus in effect a collateral attack on the interest-freezing orders issued by the state receivership court, and allowing plaintiffs to proceed with it will directly undermine that court's efforts to achieve a fair and equitable distribution of First Maryland's limited assets. For these reasons, we conclude that the district court properly exercised its discretionary power to abstain in order to avoid needless conflict with the ongoing state receivership proceedings.[16]
 
 B
 
 49
 The plaintiffs' primary argument against Burford abstention is that one of the claims made here--the civil RICO claim--could not be asserted in the state receivership proceedings, because, in their view, federal jurisdiction over civil RICO claims is exclusive.[17] As we have noted in the context of Colorado River abstention, " 'the presence of federal-law issues must always be a major consideration weighing against surrender' [of federal jurisdiction], ... [a] consideration [that] is even more significant when federal jurisdiction is exclusive." Kruse v. Snowshoe Co., 715 F.2d 120, 124 (4th Cir.1983), quoting Moses Cone, 460 U.S. at 26, 103 S.Ct. at 942. Whether civil RICO claims lie within the exclusive jurisdiction of the federal courts is a question that has been debated in the lower federal courts in recent years. Compare, e.g., Lou v. Belzberg, 834 F.2d 730, 735-39 (9th Cir.1987) (finding jurisdiction to be concurrent); DUBROFF v. DUBROFF, 33 F.2d 557, 562 (5th Cir.1987) (same) and HMK Corp. v. Walsey, 637 F.Supp. 710, 717 (E.D.Va.1986) (same), aff'd on other grounds, 828 F.2d 1071 (4th Cir.1987)with Kinsey v. Nestor Exploration Ltd.-1981A, 604 F.Supp. 1365, 1370-71 (E.D.Wash.1985) (finding jurisdiction to be exclusively federal). The Supreme Court has not spoken on the issue, and only two of the federal circuits--the Fifth and Ninth--have directly addressed it.
 
 
 50
 Analysis must begin with the well-established presumption that state courts may assume jurisdiction over cases arising under federal law, Gulf Offshore Co. v. Mobil Oil Corp., 453 U.S. 473, 477-78, 101 S.Ct. 2870, 2874-75, 69 L.Ed.2d 784 (1981), citing Charles Dowd Box Co. v. Courtney, 368 U.S. 502, 507-08, 82 S.Ct. 519, 522-23, 7 L.Ed.2d 483 (1962) and Claflin v. Houseman, 93 U.S. 130, 136, 23 L.Ed. 833 (1876). This presumption may be rebutted in three ways: "by an explicit statutory directive, by unmistakable implication from legislative history, or by a clear incompatibility between state-court jurisdiction and federal interests." Gulf Offshore, 453 U.S. at 478, 101 S.Ct. at 2875. We consider these in order.
 
 
 51
 The RICO statute contains no provision explicitly limiting jurisdiction over the private cause of action conferred by Sec. 1964(c) to the federal courts. The statute simply provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 ... may sue therefore in any appropriate United States district court." 18 U.S.C. Sec. 1964(c). The Supreme Court has repeatedly refused to interpret provisions like this, which confer jurisdiction on the federal courts but say nothing about its exclusivity, as divesting the state courts of their presumptively concurrent jurisdiction. See Gulf Offshore, 453 U.S. at 479, 101 S.Ct. at 2875 ("It is black letter law ... that the mere grant of jurisdiction to a federal court does not operate to oust a state court from concurrent jurisdiction over the cause of action."); Charles Dowd, 368 U.S. at 502, 506, 82 S.Ct. at 519, 522 (jurisdictional provision on Labor Management Relations Act providing that suits for violation of Act "may be brought in any district court of the United States having jurisdiction of the parties, without respect to amount in controversy or without regard to the citizenship of the parties" did not divest state courts of concurrent jurisdiction over those actions). We therefore conclude that the presumption of concurrent jurisdiction is not rebutted by the language of the statute itself.
 
 
 52
 Nor do we find in RICO's legislative history any "unmistakable implication" of congressional intent to make jurisdiction over civil RICO claims exclusively federal. The legislative history contains no indication that Congress ever expressly considered the question of concurrent jurisdiction; indeed, as the principal draftsman of RICO has remarked, " 'no one even thought of the issue.' " Flaherty, Two States Lay Claim to RICO, Nat'l L.J., May 7, 1984, at 3, col. 1 (quoting Professor G. Robert Blakey). Proponents of exclusive jurisdiction, however, argue that congressional intent to confine civil RICO claims to the federal courts can be inferred from the fact that the private right of action created by Sec. 1964(c) was patterned after Sec. 4 of the Clayton Antitrust Act, 15 U.S.C. Sec. 15, which creates a private action for treble damages that has long been held to be maintainable only in federal court. See County of Cook v. MidCon Corp., 574 F.Supp. 902, 912 (N.D.Ill.1983), aff'd on other grounds, 773 F.2d 892 (7th Cir.1985); Greenview Trading Co. v. Hershman & Leicher, 108 A.D.2d 468, 489 N.Y.S.2d 502, 504-05 (1985). Congress' intent to limit civil RICO jurisdiction to the federal courts can be presumed from its use of the antitrust statute as a model for Sec. 1964(c), so the argument goes, because the "[l]egislators must have known" that courts have construed Sec. 4 of the Clayton Act as making federal jurisdiction over private antitrust actions exclusive. See County of Cook, 574 F.Supp. at 912.
 
 
 53
 We do not think the modeling of Sec. 1964(c) on Sec. 4 of the Clayton Act gives rise to the sort of "unmistakable implication" of congressional intent to confer exclusive jurisdiction necessary to overcome the presumption of concurrent jurisdiction. We base this conclusion primarily upon the Supreme Court's decision in Sedima. There the Court rejected the argument that congressional intent to incorporate the Clayton Act's special standing requirements could be inferred from the fact that Sec. 4 had served as a model for Sec. 1964(c). See 473 U.S. at 485, 105 S.Ct. at 3279. The Court reasoned that such an interpretation of Sec. 1964(c) would be contrary to Congress' express admonition that the RICO statute " 'be liberally construed to effectuate its remedial purposes.' " Id. at 498-99, 105 S.Ct. at 3285-87, quoting Pub.L. No. 91-452, 84 Stat. 941, 947 (1970). Indeed, said the Court, if this legislative mandate of liberal construction is to be honored anywhere, it should be in interpreting the scope of the private cause of action conferred by Sec. 1964, for it is there that RICO's broad remedial purposes are most evident. Id. at 492 n. 10, 105 S.Ct. at 3283 n. 10. While Sedima involved standing rather than jurisdiction, we think its message is clear: the relationship between Sec. 1964(c) and Sec. 4 cannot serve as the basis for reading into Sec. 1964(c) limitations that are not apparent from its plain language. We therefore conclude that RICO's legislative history provides no basis for deviating from the usual presumption of concurrent jurisdiction. See Lou, 834 F.2d at 736-37; HMK, 637 F.Supp. at 717-18; Cianci v. Superior Court, 40 Cal.3d 903, 221 Cal.Rptr. 575, 710 P.2d 375, 379 (1985); see also MidCon, 773 F.2d at 905 n. 4 (dicta expressing doubt that the analogy to antitrust law is sufficiently strong to overcome the presumption of concurrent jurisdiction).
 
 
 54
 Finally, we find no "clear incompatibility" between the state courts' exercise of jurisdiction over civil RICO claims and any federal interests. It has been suggested that such an incompatibility may be found in the overall structure of the RICO statute. See Kinsey, 604 F.Supp. at 1370-71. In Kinsey, the court noted that criminal prosecutions under the RICO statute may be brought only in federal court, see 18 U.S.C. Sec. 1963; that many of the statute's civil provisions may be enforced only by federal officials, see id. Secs. 1966, 1968; and that the statute's extended venue and service-of-process provisions are applicable only in federal court, see id. Sec. 1965. Given Congress' allocation of primary responsibility for enforcement of the RICO statute--both criminal and civil--to federal officials acting in federal courts, the court reasoned, it surely did not intend to allow the private right of action created by Sec. 1964(c) to be brought in state court. See 604 F.Supp. at 1370-71 ("[We do] not believe it appropriate to dissect a statutory scheme, select one narrow provision thereof, and determine that with respect to that one provision at least, congressional silence is the equivalent of an affirmative grant of jurisdiction to the [state courts].").
 
 
 55
 We disagree with this analysis for several reasons. First, and most fundamentally, concurrent jurisdiction in the state courts need not be expressly conferred but is presumed from congressional silence. See Lou, 834 F.2d at 738, citing Gulf Offshore, 453 U.S. at 477-78, 101 S.Ct. at 2874-75. Second, the fact that the provisions of the statute dealing with governmental enforcement of the anti-racketeering laws do not authorize action by state officials says nothing about the nature of the private enforcement mechanism created in Sec. 1964(c). See Lou, 834 F.2d at 738 n. 7. Finally, the fact that the statute's expansive venue and service-of-process provisions are applicable only in federal court has no significance here, for the state courts retain the authority to promulgate procedural rules for their own courts, subject only to constitutional limitations. We conclude that the overall structure of the RICO statute indicates no "clear incompatibility" between state court adjudication and federal interest.
 
 
 56
 Nor are we persuaded that civil RICO claims raise such complex issues of federal law that state court adjudication of them is "incompatible" with federal interests. See Gulf Offshore, 453 U.S. at 483-84, 101 S.Ct. at 2877-78 (suggesting that considerations of uniformity and judicial economy may support finding that the state courts' exercise of jurisdiction over a cause of action that is "peculiarly federal" is "incompatible" with federal interests). It is true that most of the predicate acts necessary to make out a RICO violation are defined by reference to federal criminal statutes. But civil RICO cases seldom require sophisticated analysis of the underlying federal statutes, for most disputes concerning predicate acts are purely factual. See HMK, 637 F.Supp. at 717. In addition, the vast majority of civil RICO cases involve claims of garden-variety fraud, with which the state courts are well acquainted. Id. While the RICO statute concededly contains several provisions that present difficulty in application, we do not think the danger of inconsistent results is sufficient to rebut the presumption of concurrent jurisdiction. To the contrary, we think the statute's broad remedial purposes are best served by offering civil RICO plaintiffs the opportunity to choose between the federal and state courts. Lou, 834 F.2d at 738-39; Cianci, 710 P.2d at 376-82; see Rice v. Janovich, 109 Wash.2d 48, 742 P.2d 1230, 1233-35 (1987) (en banc).
 
 
 57
 In sum, we conclude that the presumption that the state courts enjoy concurrent jurisdiction over civil RICO claims is not rebutted by the express language of the statute itself, by unmistakable implication from its legislative history, or by a clear incompatibility between state court adjudication and federal interests. We therefore hold, with the Ninth Circuit in Lou, that the state and federal courts share concurrent jurisdiction over civil RICO claims. Since this in turn means that the surrender of federal jurisdiction over the plaintiffs' claims against the First Maryland defendants will not result in the loss of any federal rights, we conclude that the district court did not abuse its discretion in dismissing those claims under Burford.[18] In consequence, we find it unnecessary to consider the alternative possibility of Colorado River abstention.
 
 IV
 
 58
 For the reasons set forth above, the district court's order of dismissal is affirmed.
 
 
 59
 AFFIRMED.
 
 
 
 [1]
 MSSIC was governed by an eleven-member Board of Directors. Three of the eleven directors were appointed by the Governor; the remainder were elected by MSSIC's member institutions
 
 
 [2]
 Section 9-710 reads as follows:
 Sec. 9-710. Jurisdiction of circuit court.
 (a) In general.--(1) Notwithstanding any other provision of law and to the maximum extent permitted under the federal and State constitutions, the circuit court administering a conservatorship or receivership under this title shall have exclusive and plenary jurisdiction over all claims, actions, and proceedings that are brought by any person and that are related to the assets, property, powers, rights, privileges, duties, and liabilities of:
 (i) The savings and loan association and its subsidiaries, affiliates, or holding company;
 (ii) The receivership or conservatorship estate; and
 (iii) The State of Maryland Deposit Insurance Fund Corporation in its capacity as receiver or conservator of the savings and loan association.
 (2) A court other than a court administering a conservatorship or receivership under this title may exercise jurisdiction over claims and actions if:
 (i) The court would have jurisdiction over the claims or actions but for this section; and
 (ii) The court administering the conservatorship or receivership approves:
 
 
 [1]
 The initiation and prosecution, or the continued prosecution, of the claims or actions in the other court by the conservator or receiver; or
 
 
 [2]
 The continued prosecution of claims or actions in the other court by any person other than the conservator or receiver
 (b) Transfers.--Except as otherwise ordered by the court administering the conservatorship or receivership, any action or proceeding described in subsection (a)(1) of this section that is pending at the time the conservatorship or receivership is established under this title shall be transferred to the circuit court administering the conservatorship or receivership. (1986, ch. 11, Sec. 2.)
 
 
 [3]
 According to the amended complaint, the class consists of more than 22,000 individuals
 
 
 [4]
 First Maryland has been voluntarily dismissed from the action and is not a party to this appeal
 
 
 [5]
 18 U.S.C. Sec. 1962 provides:
 Sec. 1962. Prohibited Activities
 (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or [sic] racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.
 (b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.
 (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
 (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.
 
 
 [6]
 The fact that the discrete objectives of each of the predicate acts were all of the same basic type would not, of course, prevent the predicate acts from constituting a pattern. As we said in Walk, the pattern requirement cannot be avoided by " 'the semantical game of generalizing th[e] illegal objective' " of the related predicate acts. See 847 F.2d at 1106, quoting Montesano v. Seafirst Comm. Corp., 818 F.2d 423, 426 (5th Cir.1987)
 
 
 [7]
 Section 1964(c) reads in full as follows:
 Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.
 18 U.S.C. Sec. 1964(c).
 
 
 [8]
 The civil RICO claimant need not, however, plead and prove a distinct "racketeering injury." Sedima, 473 U.S. at 495, 105 S.Ct. at 3284
 
 
 [9]
 As the district court noted, the great bulk of the allegations against the MSSIC defendants concern their allegedly negligent or grossly negligent failure to carry out their statutory duty to regulate the financial practices of MSSIC's member institutions. See Amended Complaint paragraphs 58-80
 
 
 [10]
 The defendants correctly point out that while, as we have noted, it is not necessary to establish detrimental reliance by the victim in order to make out a violation of the federal mail fraud statute, see Armco Indus., 782 F.2d at 481-82, such reliance is necessary to establish injury to business or property "by reason of" a predicate act of mail fraud within the meaning of Sec. 1964(c)
 
 
 [11]
 We are aware of the Sedima Court's admonitions that RICO's civil remedy provisions are to be "liberally construed" and that Congress did not intend civil RICO claimants to be unduly hampered by the interrelated "strict requirements [of] 'standing' to sue and 'proximate cause' " appropriate in the related antitrust context. Sedima, 473 U.S. at 498, 105 S.Ct. at 3286. But these admonitions obviously were not intended to read the traditional proximate cause concerns of tort law completely out of civil RICO, leaving only a cause-in-fact requirement. They were made in the context of a rejection of the view that RICO injury, like antitrust injury, see Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977), must be of a special type causally connected to the anti-competitive effects of the basically proscribed conduct rather than the normally compensable type of injury flowing from the basically proscribed conduct (predicate acts) itself. This rejection clearly relaxes the RICO proximate cause test from that applied in antitrust, by focussing inquiry on more direct cause and effect relationships than the necessarily more attenuated ones implied by the amorphous concepts of "anti-competitive" injury and violation. But it is plain that with the matter of RICO injury and RICO violation thus settled, the Sedima Court assumed that the normal proximate cause inquiry into their relationship would be appropriate. See id. 473 U.S. at 497, n. 15, 105 S.Ct. at 3285, n. 15. Our inquiry proceeds within those bounds
 
 
 [12]
 In light of this conclusion, we find it unnecessary to address the alternative argument, strenuously advanced before us by the six MSSIC member institutions that are joined as defendants, that they cannot be held liable in any event for the alleged misconduct of MSSIC's officers and directors. In terms of our analysis, it is plain that the causal connection between their conduct and the plaintiffs' injury is even more attenuated--"legal" cause less evident--than that of the MSSIC directors themselves
 
 
 [13]
 We agree with the district court that the plaintiffs have stated a civil RICO claim against the First Maryland defendants
 
 
 [14]
 As the Court explained:
 The State provides a unified method for the formation of policy and determination of cases by the Commission and by the state courts. The judicial review of the Commission's decisions in the state courts is expeditious and adequate. Conflicts in the interpretation of state law, dangerous to the success of state policies, are almost certain to result from the intervention of the lower federal courts. On the other hand, if the state procedure is followed from the Commission to the State Supreme Court, ultimate review of the federal questions is fully preserved here.
 319 U.S. at 333-34, 63 S.Ct. at 1107.
 
 
 [15]
 There is no merit to the plaintiffs' contention that MDIF "lacks standing" to maintain this action because the receivership order has relieved it of the obligation to pay them interest. The plaintiffs' loss of interest on their deposits is derivative of the loss First Maryland itself suffered when the defendants misappropriated its assets, including some of the plaintiffs' deposits, preventing it from earning income on those assets. The fact that the receivership court has relieved the institution of its debt to the plaintiffs does not negate the fact that the institution itself suffered that loss of income
 
 
 [16]
 Federal courts have frequently invoked the Burford doctrine to avoid interference with ongoing state receivership proceedings. See, e.g., Law Enforcement Ins. Co. v. Corcoran, 807 F.2d 38 (2d Cir.1986) (Burford abstention appropriate in contract action against insurance company which was in liquidation); Levy v. Lewis, 635 F.2d 960 (2d Cir.1980) (Burford abstention appropriate in action brought against insurance company in liquidation by its former employees for wrongful termination of retirement benefits); Mathias v. Lennon, 474 F.Supp. 949 (S.D.N.Y.1979) (Burford abstention appropriate in action by policyholders against insolvent insurance company); cf. Pennsylvania v. Williams, 294 U.S. 176, 55 S.Ct. 380, 79 L.Ed. 841 (1935) (pre-Burford case). Indeed, several district courts in this circuit, in addition to the court below, have already dismissed cases arising out of the Maryland savings and loan crisis on Burford abstention grounds. See American Casualty Co. v. Community Sav. & Loan, 635 F.Supp. 539 (D.Md.1986); Northern Virginia Law School, Inc. v. Hughes, No. B-85-3200 (D.Md. Nov. 22, 1985) [available on WESTLAW, 1985 WL 9450]; Tafflin v. Levitt, Nos. N-87-668/684 (D.Md.1987)
 
 
 [17]
 The plaintiffs also argue that the Burford doctrine is inapplicable for two additional reasons. First, they contend that Burford abstention is inappropriate because Maryland has not created a specialized state court to handle all claims arising out of the savings and loan crisis. This claim is refuted both by the facts of this case and by our decision in Browning-Ferris, Inc. v. Baltimore County, Md., 774 F.2d 77, 80 (4th Cir.1985) (existence of a specialized state court with jurisdiction to decide only certain kinds of cases is not an absolute prerequisite to Burford abstention). Second, they argue that Burford abstention is inappropriate because they seek damages rather than injunctive relief. This argument has no merit. While the origins of the abstention doctrines may lie in the limitations of federal equity jurisdiction, it is now well-established that they apply to actions at law as well. See 17A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure: Jurisdiction Sec. 4241, at 17-18
 
 
 [18]
 Since the object of Burford abstention is to avoid disruption of a comprehensive state regulatory apparatus, the proper course is to dismiss the action rather than simply staying it pending action by the state courts. See Burford, 319 U.S. at 334, 63 S.Ct. at 1107; 17A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure: Jurisdiction Sec. 4245, at 101-102. This disposition in no way prejudices the plaintiffs' right to refile their federal claims in state court, should they so desire